1836.

Le Roy *v.* The Globe Insurance Company, *et al.*

LE ROY
*v.*
THE GLOBE
INSURANCE
COMPANY.

The direct ors of the G. Insurance Company passed a resolution on the tenth of November, 1836, declaratory of a dividend; and on the thirtieth day of the same month such dividend was carried, on the books of the company, to profit and loss, leaving the capital entire and a further surplus to the credit of the company for profits then earned and not divided. Public notice was given (in the newspapers of the eleventh of November) that this dividend would be paid on and after the first of December. Checks on one of the banks were prepared and filled up with each party's dividend. These checks were all dated the first of December, signed by the president and made payable to the order of the secretary of the company and were placed in the hands of the latter to be endorsed by him and delivered over to the stockholders as they should call. About 4-5ths of these checks had been called for. The great fire rendered the insurance company insolvent and its affairs fell into the hands of receivers under the act. A stockholder, who was entitled to participate in this dividend, came, after the fire, for his check and it was refused him. Question, whether the dividend for him had been so far set apart as to give him a right to it notwithstanding the insolvency of the company and the passing of their affairs into receivers hands or whether it fell back into the general property of the company : *Held,* that the dividend had been severed and the stockholders were entitled to it.

---

The facts in this case, as they appeared by the pleadings, were briefly these.

The complainant and Catharine A. Newbold, since deceased, as guardians of infants, were stockholders of the Globe Insurance Company. These persons possessed one hundred and ten shares of its capital stock, the par value of each share being fifty dollars. The said company was incorporated for insurance against loss by fire, with a capital of one million of dollars, and conducted its business in the city of New York.

At a meeting of the directors of the company held on the tenth day of November, one thousand eight hundred and thirty-five, a statement of its affairs, up to the first of December then next, was exhibited by the proper officers and committees of the company, showing a surplus fund, arising from profits then earned and undivided, amounting to seventy-six thousand, four hundred and twenty-nine dollars and sixty-nine cents.

On the exhibition of these statements, the directors, by a resolution passed on the same day, declared a dividend of three and one half per centum on the capital stock of the company, for the six months then last past, to be paid out

*August, 1836.*

*Insurance Company. Severance of dividend from capital.*

of such surplus profits on and after the first day of December then next. This dividend amounted to thirty-five thousand dollars, which sum, on the thirtieth day of November, one thousand eight hundred and thirty-five, was carried, in the books of the company, to the debit of profit and loss; leaving the capital then entire and a further surplus to the credit of the company, for profits then earned and not divided, amounting to forty-one thousand four hundred and twenty-nine dollars and sixty-nine cents. Notice of this dividend and that it would be paid on and after the first day of December was given in the public papers on the eleventh day of November one thousand eight hundred and thirty-five. Checks or drafts on the Merchants Bank were accordingly prepared, such checks being severally filled up for the amount of the dividend payable to each stockholder. These checks were all dated the first day of December, one thousand eight hundred and thirty-five. They were signed by Henry Rankin, President, made payable to the order of Richard Dunn, Secretary of the company, and were placed in the hands of the latter, to be endorsed by him and delivered over to the stockholders, as they should call for them, on their signing receipts for the same in the dividend book. Between the first and seventeenth days of December, about four-fifths, in amount, of these checks, were called for by and were delivered to stockholders and duly paid on presentment at the bank.

Among the checks thus filled up and signed, was one for one hundred and ninety-two dollars and fifty cents, intended to pay the dividend due to the complainant and Mrs. Newbold on their one hundred and ten shares of stock and to be delivered to them.

On the night of the sixteenth of December, one thousand eight hundred and thirty-five, the great fire took place in the city of New York: the complainant and other stockholders, to the amount of about one fifth in value, not having then called for their dividends. On the eighteenth of the same December, the complainant applied for the check payable to him and Mrs. Newbold, to the secretary, who, acting under the orders of the directors, refused to deliver it or otherwise pay the dividend, on the ground that the com-

pany had sustained losses by the fire above mentioned to an amount which had rendered it insolvent.   On application to the directors, the same answer was given ; and the dividend remained unpaid.

On the twenty-fifth day of January, one thousand eight hundred and thirty-six, the directors declared the company to be insolvent; and three of them, namely, the defendants, Henry Rankin, Isaac Carow and James Heard were (under the act) appointed receivers of its estate and effects.   The declaration of insolvency and a certificate of the appointment of the receivers, both under the seal of the company, were filed with the clerk of the court of chancery for the first circuit ; on the same day and thereupon the receivers took upon themselves the duties of their office and possessed themselves of all the estate of the company, including the unpaid portion of the said dividend.

At the time of the above mentioned loss, the complainant was insured by the same company to the amount of one thousand four hundred dollars against loss by fire on buildings belonging to him.   The insurance was originally made by a policy dated in one thousand eight hundred and twenty-nine, and, afterwards, annually renewed.   The last renewal was made on the second day of November one thousand eight hundred and thirty-five for thirteen months and twenty-six days, the premium for which amounted to one hundred and twenty dollars and twenty-nine cents.   Soon after the fire, the directors of the company invited the holders of policies, on which the risks were still pending, to cancel them ; and the same course was pursued after their appointment by the receivers.   In pursuance of this invitation, the complainant consented to cancel his policy, but the receivers, being doubtful of their authority to return any portion of the premium without the direction of some competent court, proposed that the policy should be cancelled, under a reservation of the complainant's right to claim for and receive the unearned portion of the premium.   The policy was cancelled accordingly under such reservation.

The bill alleged and the answer admitted that insurance on the same risk could not then be made without the payment of a much higher premium.

1836.

LE ROY
*v.*
THE GLOBE
INSURANCE
COMPANY.

No part of the premium had been refunded, nor had the dividend or any part of it been paid.

The bill, which was filed by the complainant, as well for himself as for other stockholders of the company claiming under the like circumstances, prayed that the rights of such stockholders, in respect to the said dividend and the complainant's right in respect to the said premium, might be settled by the decree of the court, and that the receivers, out of the assets of the company in their hands, might be decreed to pay to the complainant and to the other stockholders who should come in and claim the benefit of and contribute to the expenses of this suit, the sums due to them respectively, in respect to the said dividend, and to the complainant so much of the said premium as was unearned at the time of cancelling his policy; and for relief generally.

The answer, admitted the general statements of the bill and alleged that there was no specific appropriation to meet the dividends, but that they were paid out of the general funds or mass of the monies belonging to the company and deposited by them in the Merchant's bank.

The defendants insisted on an equal distribution of all the assets of the company and submitted themselves to the direction and decree of the court.

Mr. *T. L. Ogden*, for the complainant.

As to the right of the complainant and other stockholders, under the same circumstances, to receive the dividend declared on the tenth day of November, and payable on the first of December, one thousand eight hundred and thirty-five: The thirty-five thousand dollars, constituting the dividend, was abstracted and set apart from the general estate of the corporation by the resolution of the directors of the tenth of November, and by the subsequent entry in their books charging this sum to the debit of profit and loss. Each stockholder, by these acts, acquired a vested right in his dividend, for the recovery of which assumpsit would lie in their own several names. The checks, drawn and signed and placed in the hands of the secretary for each stockholder, were a still more distinct appropriation in favor of

such stockholders. They amounted, in equity, to an assignment, *pro tanto*, of the funds in the hands of the bank; and the bank, after notice, would have been liable to the stockholders entitled to the checks. The manner of paying the dividend was a matter of form, which could not affect the substance of the transaction. If, instead of leaving the thirty-five thousand dollars in the Merchants bank to their own credit, the company had caused that sum to be placed to the credit of their secretary, to be paid on his checks, he would then have been the trustee of the stockholders. According to the mode of payment adopted by the company, they were the trustees; and in that character only were possessed of the fund. They ceased to have any beneficial interest in it after its appropriation to the use of the stockholders. It could not, therefore, pass by assignment. Even under the bankrupt laws of England, trust property does not pass to the assignees, on the principle that the assignment passes such property only as the bankrupt was possessed of for his own benefit: *Winch* v. *King*, 1 T. R. 619. The act of the eighteenth of January, one thousand eight hundred and thirty-six, vests in the receivers all the estate of the corporation; but, like any other assignment, by operation of law, it passes the rights of the corporation precisely as they possessed them: *Brown* v. *Heathcote*, 1 Atk. 159: *Mitford* v. *Mitford*, 9 Ves. 86. Even without notice, the receivers would have taken the property subject to whatever equities the corporation were liable to. But, in this case, the receivers were the directors of the company, and took with express notice of the rights of the unpaid stockholders. The principles of the English bankrupt laws, with respect to property in the possession of bankrupts, as reputed owners, would not apply to a case of this kind as between creditors and third persons: *Ex parte Marsh*, 1 Atk. 157. Here, there can be no pretence of complaint on the part of creditors on the ground of any credit given to the company on the faith of the dividend. They looked to the capital of the company, which was preserved entire, with a large surplus, exclusive of the dividend. The dividend of the first of December, one thousand eight hundred and thirty-five, was public and notorious and, so far as cre-

ditors were concerned, was considered as paid. The receivers, therefore, can be in no situation, with regard to the unpaid position of this dividend, different from that of the company itself. If the stockholders have a legal and equitable claim against the company, they have the same claim against the receivers.

As to the Return of Premium.

. Upon the occurrence of the great fire, the different fire insurance companies were understood to have incurred losses to an amount more than sufficient to absorb all their means, to indemnify those whose property was insured and already destroyed. It was essential that the existing assets of the companies should not be subjected to diminution by further casualties ; and on this principle of public policy, the act of the eighteenth day of January, one thousand eight hundred and thirty-six, (section nine) authorized the receivers to make new insurances against all outstanding risks and to pay the premiums out of the assets in their hands. ('These insurances to be offered to the holders of pending policies on their cancelment. If refused, the new insurance to be held for the benefit of the corporation and the holder of every unexpired policy to stand as a creditor of the company to the amount of the unearned premium at the time it became insolvent.) Upon the equitable principle thus recognized by the Legislature, the receivers invited the complainant to cancel his policy. He consented to do so— to make the new insurance and pay the premium ; but, as the receivers were doubtful whether the legal authority to return any portion of premium that " might be unearned on said policy or any policies on which risks were then pending, without the order and direction of some court of competent jurisdiction, they proposed that the right of the complainant to receive and claim any unearned should be reserved." This was also assented to ; and the policy was cancelled by indorsement on said policy or on the books of the company, but nevertheless saving and reserving thereby the complainant's right to unearned premium.

The right reserved then is that of the complainant to " unearned premium," which right is now submitted to this court. The equity of the complainant to a return of pre-

mium, in proportion to the unexpired part of the original term of the insurance, is conceived to be undeniable, on general principles. The Company had received from the complainant a valuable consideration for the assumption of a risk, from which the receivers, acting for the benefit of the creditors of the company, desired that it should be relieved. The complainant consented to relieve them; and, by cancelling the contract, to reinstate each party in the antecedent rights. It would be contrary to the plainest principles of justice that the entire benefit of this new contract should be gained by one party and the entire loss sustained by the other. The equity of the complainant to a return of the premium, grounded on the failure of the consideration for which it was paid, is recognized and established by the act of the Legislature. The principle upon which to ascertain the amount of the return, must be considered as the question intended to be reserved on cancelling the policy. And that principle must be, either:——— 1st, according to the rate of premium originally paid—applying it to the unexpired portion of the term insured:—or,——2nd, according to the premium actually paid by the complainant for the new insurance. The latter is the principle adopted by the act. It gives indemnity to the complainant and subjects the receivers to no greater expense than they would have been compelled to pay if the insurance had been made in their own names and then assigned to the complainant in pursuance of the course contemplated by the act and for which that actually adopted was a mere substitution.

Mr. *D. Lord*, on the part of the defendants.

As to the unpaid dividends.

As long as the moneys designed to meet dividends remained at the credit of the Insurance Company in the Bank, or among its monies on hand, it was corporate property. If the bank had failed instead of the insurance company, the loss of the money designed to meet its dividend would not have fallen upon the persons to whom the checks were intended, but would have fallen on the company at large. No doubt can exist that the company at large could have

*1836.*

LE ROY
*v.*
THE GLOBE
INSURANCE
COMPANY.

appropriated the money upon which the checks were drawn to any other purpose and supplied new funds to meet the dividends; and in all respects, these checks were no more an appropriation of specific monies to a specific person so as to create a trust than an undelivered check drawn by any individual intended to be afterwards applied to pay a debt. While undelivered, the monies remained a part of his general estate, subject to be directed to any other purpose, to become void by any accident or act interfering with the actual delivery. It, therefore, is impossible to conceive how monies, not at the risk of the stockholders as dividend-claimants, they not holding any perfected voucher, moneys not separated except in mere imperfected intention from the corporate property, can be treated as a seperate trust specifically traceable. The want of delivery of the checks is an essential and fatal circumstance in the way of such dividend-claimants; and affords, it seems, a decisive answer to the claim for a specific appropriation.

Does the declaring of a dividend create the dividend-claimants creditors entitled to rateable payment in equity with the other creditors? The stockholders of a company are in the character of insurers as to all the property which they have invested or suffered to remain in the common fund. It certainly cannot be contended that, in case of insolvency, the liability of the company is limited to its capital. A corporation is like a natural person, liable, on general principles, to the full extent of all its funds; and the charter, by appointing the capital at a certain sum, neither limits the capacity of the corporation to hold an accretion by way of surplus, nor the liability to pay its debts in full so far as its property will extend. The object of the incorporation is simply to give perpetual succession and to enable the stockholders or joint contributors of capital to avoid responsibility beyond the funds remaining in joint stock within those limits they are mere debtors. And the question now discussed reduces itself to this: can a co-partner withdraw a balance due to him as a creditor of the joint concern, while there are debtors unpaid?

If any answer could be needed to this question in the negative, it could be supported by the considerations, that

the extending of business and policies, to which the insolvency is attributable, was for the benefit exclusively of the stockholders. Every gain by way of chance or accident was for their benefit; every control was in their hands; the existence of the dividends or surplus was their act or neglect:—why should not the consequence be at their loss? Indeed, the absurdity of a contest between stockholders, claiming part of the corporate funds as profits against creditors unpaid by reason of insolvency, is too palpable to admit of greater clearness by argument.

It is true, accident has intervened, which makes a distinction without a difference, between those stockholders who have received dividends and those who have not. But what have the creditors to do with that? It is one of the accidents of life which do not admit of redress upon any principles of law or equity. Similar accidents occur to creditors—one has sustained a loss, the right to receive which has become perfect before the great fire—others sustain loss in the great fire. Could any court interfere to say that one should be paid before the other? Would an undelivered check make any difference? If the older creditor had, by accident, called for his check on the sixteenth day of December, he would have been paid in full. Calling on the seventeenth day of December, he calls as the creditor of an insolvent corporation. As between stockholders claiming upon the corporate funds and receivers of the insolvent corporation *potior est conditio defendentis* even were there *equalis jus*, which there is not.

II. As to the unearned premiums.

By the laws of the state, in relation to outstanding contingent contracts by insolvent corporations, receivers were authorized to return them *pro rata* on a cancelment of the contract. This was a measure of policy merely to enable receivers to bring these insolvent concerns to a close within some reasonable time. It was not on the ground of failure of consideration. The consideration had not failed. The contract to which it had given rise remained. The insurance company remained liable for future losses. The indemnity would, in any event of loss, have far exceeded the

premium. It might as well be contended that one who had sold goods for an outstanding note should recover them back on the insolvency of the maker. Under the R. Statutes then, the unearned premiums were returnable at the discretion of the receivers (and this is to be borne in mind *pro rata*) and the insolvency did create a liability for a re-insurance. Then, the act of Jany. 18, 1836, carries the principle of policy still farther, in giving to the receivers the discretion to make re-insurances simply with a view to the possibility of winding up the concerns of the company. They have not done so in this case—they have made no re-insurance—they have had no occasion to do so. It was a discretion which they have not exercised. It was burden-some upon the assets of the company to have it exist and to compel the company, when they had become insolvent, to pay back premiums received, as the price of solvent insu-rance, when the insured did not give up solvent policies in return and it was not by the spirit of that act to be exer-cised without the necessity of the case and the discretion of the receivers.

Whether, indeed, the holders of policies, situated like the complainants, are entitled to the full rateable unearned pre-mium or a dividend thereon only, seems to be the only ques-tion; and that the receivers deem it sufficient simply to submit without argument: having no right in this respect, by concessions, to lessen the funds which they hold for creditors.

Mr. *T. L. Ogden,* in reply.

I. As to the unpaid dividend.—The bill proceeds on the ground that it was separated from the other property of the company and had ceased to constitute any part of the assets which passed to the receivers.

This separation was effected. 1st. By the resolution of the directors of the tenth day of November, passed in pur-suance of a public trust or duty imposed on them by the Act of Incorporation. 2nd. By the entry of the thirtieth of November in which the dividend was placed, to the debit of profit and loss, and thus effectually separated from the

disposable effects of the company. 3rd. By the checks in favor of each stockholder for his portion of the dividend—and finally 4th. By the actual payment and distribution of the dividend on and after the 1st of December among those stockholders who applied for it.

If the resolution of the tenth day of November was, in its nature, revocable prior to the first of December, it then ceased to be so. If executory before, it was then executed. After the first of December and after payment of the dividend, the directors could not have suspended its further payment without a violation of their duty. The Supreme Court would have enforced its payment by mandamus—but, in point of fact, the directors have not attempted to revoke the resolution. The receivers took the property with notice of and subject to the appropriation thereby made, and whether, under the forms pursued by the company, they or their officers holding the checks were the trustees of the stockholders for the payment of the dividend, is immaterial. The fund set apart and appropriated for the purpose belonged, not to the company: but to the stockholders. It has passed into the hands of the receivers, with notice of its appropriation; and they, according to the established doctrine of the court, have thus become the trustees for its distribution.

These obvious principles of equity are not met by the answer, nor by the answering argument on the part of the defendants.

It is said in the argument:—That, because the money remained to the credit of the company, it was corporate property. That the company could have used it for their own purposes, and that, if the bank had failed, the company would have remained liable. These remarks would apply to every case of trust. The question here is, not who held the fund constituting the dividend, but to whom it beneficially belonged.

A trustee having the control of money for the use of another, may use it for purposes beneficial to himself and injurious to his *cestui que trust*, but this power to violate a trust is no argument against the existence of the trust or its due execution. If the trust fund had been lost by the

failure of the bank or through any cause consistent with the good faith and reasonable care of the trustee, it would present a question dependent on different principles altogether. Thus, supposing the company had paid over the dividend to their secretary and had given notice of that fact to the stockholders or had deposited the money in the bank as a special fund for the benefit of the stockholders, and, having notified them of such disposition of it, the stockholders had neglected to draw the money until the secretary in the one case or the bank in the other had become insolvent, it might well be questioned whether the company would not be discharged. This, however, is a very distinct question from that presented by the pleadings in this case; and it is unnecessary to discuss it.

It is said also : that an incorporated company may acquire funds beyond its capital and is liable to the full extent of its property. This is not denied :—but the question recurs : —what is its property? If dividends, fairly and justly divided and leaving to creditors all and much more than the law required to be left belong, after the dividend, to the stockholders, and not to the company collectively, then, there is nothing in this argument. Again. This case is likened to that of a partnership, in which a co-partner, having an individual balance in the concern, cannot claim it against creditors. The two cases are altogether different. Partners are jointly and severally liable to creditors, to the whole extent of the debts due to the latter. Acts, incorporating companies for insurance and other branches of business connected with the public convenience, are intended to guard individuals from this personal liability; the policy of these acts is to encourage trade by securing to individuals, as well as to the public, the enjoyment of their appropriate privileges and rights.. The directors of these corporations are, by the nature of their office, trustees as well for the stockholders as for creditors, and whilst they are bound to maintain inviolate the capital of the company and to apply it faithfully to the payment of its debts, are equally bound to account to the stockholders for the legitimate profits of its business. Whilst, therefore, the power of the court will be exerted to secure to creditors a faithful appli-

cation of the joint property of a corporation, it will be equally exerted to secure to the individual stockholders what, in the shape of earned profits, has been fairly and legitimately separated from the joint property and become vested in such individuals. The argument (on this point) of the defendants counsel would apply to those large profits of the company which remained undivided after the dividend of the first of December, but it has no application to those which were then fairly divided and distinctly appropriated to the stockholders.

II.—As to the unearned Premium.

The policy of the general Act relative to insolvent corporations (2 R. S. 470, § 75,) like that of the act of 18th January, 1836, was to accelerate the adjustment of the affairs of such corporations and to secure their creditors against contingent liabilities by cancelling the contracts creating them. To encourage and enforce this policy, both acts authorize a return of the full unearned portion of the premium ; but the last farther authorises the receivers to make re-insurances, and if, on a tender of the new policy, the holder of the old one refuse to receive it, he is then to stand as a creditor for the unearned premium.

It is said that the authority is discretionary under both acts—be it so : but did not the receivers in this case virtually elect to exercise the authority? They invited the complainant and he agreed to cancel his policy. By cancelling it, the complainant became his own insurer and discharged the company from farther risk. This was precisely tantamount, as regards the company, to a new insurance and assignment. They were relieved from the risk and the complainant assumed it. It is true that the company were relieved, not by means of a new insurance and assignment, but this end was attained by a substituted process, more simple and direct, and, to them, more cheap and beneficial. The substantial object of the receivers being thus attained, they agree that the complainants' right to the unearned premium should be reserved—in other words, to pay back the unearned premium, under the sanction of a

1836.

LE ROY
v.
THE GLOBE
INSURANCE
COMPANY.

legal decision, if the complainants' right to a return of it should be thereby established. No mention is made in this reservation of a dividend on unearned premium. That principle of return was applicable only to the case of the complainants' refusal to receive a substituted insurance, which he had not refused but, on the contrary, virtually consented to receive; and so far as concerned the receivers, did receive. The argument of the defendants' counsel seems to suppose that a return of the dividend on the unearned premium would be a more correct rule by which to regulate the cancelling of policies in the case of insolvent insurance companies; and it intimates (without saying) that this rule ought to be applied to this case.

In answer to this speculative remark it may be said, 1st.—That this is not the rule adopted by the legislature. It is not that best calculated to promote the policy of the act, and, therefore, is not that which the court would feel disposed to encourage. 2nd.—That the substantial object of the authority given to the receivers being accomplished by the cancelment of the policy, the return of the whole unearned premium being the only measure of return prescribed or authorised by the act ought (in the absence of any stipulation to the contrary) to be considered as that within the contemplation of the parties. 3rd.—That, by the terms of the agreement, the complainants right to "unearned premium" is the right reserved; and, if this reserved right had reference to a dividend only on such unearned premium or to any other rule of return, that idea ought to have been distinctly expressed.

December 5.

THE VICE-CHANCELLOR:—This case does not necessarily call for a decision of the question, whether, as between the stockholders of an insolvent insurance company and the creditors, the former are entitled to all the surplus which remained with the company undivided at the time of its disaster over and above the entire capital?

Although there is here such a surplus of upwards of forty-one thousand dollars, besides the dividend, amounting to thirty-five thousand dollars, which was declared on the tenth day of November and made payable on and after the first day of December, yet the complainants, in their bill, only

1836.

LE ROY
v.
THE GLOBE
INSURANCE
COMPANY.

claim to have their parts or portions of this dividend, which they have not received, now paid over to them out of the funds in the hands of the receivers, instead of leaving the money there to be applied as assets of the company in discharge of its debts.

The complainants assert their right to the money upon the ground of its having become theirs by an express appropriation and setting apart so much out of the company's earnings for the stockholders and thereby distinguished from the general mass of the company's funds; and I am convinced that enough has been done to produce this separation in the view of a court of equity and to confer upon this amount the character of a trust fund which could not afterwards be diverted to other objects.

The investigation of the affairs of the company and the ascertainment of a clear surplus to warrant a dividend—declaring that dividend by a resolution of the board of directors—fixing the period for its payment—giving publicity to it—carrying the amount on the books of the company to the debit of profit and loss—apportioning the same among the stockholders, by filling up and signing checks upon the bank where the funds were deposited for the purpose of being delivered to each stockholder when called for:—these are all acts which the company, by its officers, might lawfully perform. These acts became binding upon the company in its corporate capacity; and gave to the stockholders individually rights which the directors and officers of the company could not afterwards take from them. If, for instance, they had refused, after the first day of December, to deliver out the checks or make payment of the dividends and no insolvency had intervened, it appears to me there would have been no difficulty in the remedy by mandamus in favor of all the stockhoders or by action at the suit of individuals from whom the payment was withheld.

Neither, I apprehend, could there be any valid objection to a bill in equity for the purpose of obtaining possession of the checks or the fund in the bank upon which they were drawn, upon the footing of its being a trust fund which the officers of the company were bound to distribute after the first day of December and over which they had no other

control. That the officers of the company considered the money which was deposited to its credit in the bank appropriated to meet the checks is evidenced by the fact that they went on delivering out checks to such of the stockholders as called for them until the seventeenth of December, when the disastrous fire had occurred; and they would have delivered checks to these complainants in like manner if they had called to receive them. It makes no difference, in my judgment, that the money was not told out and specifically set apart in the bank to meet these checks or that a separate fund was not created for the purpose or that the money intended to meet them still formed a part of the general mass standing to the credit of the company on the books of the bank: for this court can, nevertheless, lay hold of the mass and separate so much as may be necessary to accomplish what was intended and which accident alone prevented at the time. Up to the moment of the prostration of the company, the intention remained, on the part of those who were charged with the management of its affairs, to continue the appropriation and consummate the payment of the dividends which had been nearly completed. It was a matter no longer executory in the view of the parties; and so far as it remained unexecuted this court will now perform it. The intention must be fulfilled; and, for this purpose, a court of equity will consider, not merely the sums which were paid out in dividends, but the whole thirty-five thousand dollars as actually appropriated and set apart for distribution among the stockholders from and after the first day of December and regard it as a trust fund to which the stockholders had acquired vested rights—not in their corporate capacity, but as individuals to whom the money legally and equitably belonged distinct from their other interests in the funds and effects of the company.

Having acquired this right, as between them and the corporation, the assignment or transfer to the receivers could not take it away. The receivers do not stand in the light of purchasers for valuable consideration without notice; and, under such circumstances as exist here, are bound by the trust: *Adair* v. *Shaw*, 1 Sch. & Lef. 262; *Wood* v. *Dummer*, 3 Mason's R. 312.

The act of the eighteenth of January, one thousand eight hundred and thirty-six, under which the receivers were appointed, vests in them all the property and effects of the corporation; but, like any other assignment by operation of law, such as in bankruptcy or under our insolvent acts it does not pass trust property—but only such as the bankrupt or insolvent held or was possessed of or entitled to for his own benefit.

The next branch of this case is, as to the return premium claimed by the complainant on cancelling his policy.

I have recently had occasion to examine and pass upon this point, in the case of other receivers and have considered them bound, under similar circumstances, to return such portion of the premium as might be deemed unearned, when they accepted a surrender of the policy before proceeding to make a dividend amongst the creditors generally. I have now only to reiterate that opinion.

By the general act relative to the dissolution of insolvent corporations (2 R. S. 470, § 75,) receivers are authorised to cancel any open and subsisting policy or contract by consent of the party holding it. This has been done in the present case with the complainant and others ; and upon its being done, the receivers are authorized to refund such proportion of the premium for the time the policy has to run as the whole premium bears to the whole term of the risk. The object of this provision in the statute is, to enable receivers to settle up the affairs of the company with as little delay as possible and without waiting for the natural termination of outstanding and contingent risks. It may be for the interest of present creditors, as well as stockholders, to bring all such matters to a close in order to have their rights secured against the consequences of contingent liabilities of the company and so that the receivers may know, at once, all the creditors and what is the nett amount of assets to be distributed. This can effectually be done by the course adopted by the receivers ; and I think it is the true construction and just meaning of the statute that the premium spoken of to be refunded is to be returned upon the cancelment of the policies. It is, indeed, a condition precedent. The language of the statute is, "and upon such

1836.

LE ROY
v.
THE GLOBE
INSURANCE
COMPANY.

amount being paid by such receivers to the person holding or being the legal owner of such engagement, it shall be deemed cancelled and discharged as against such receivers."

Thus, they are first to pay, in order to obtain an effectual cancellation. How, then, can such policy-holder be required to come in as a creditor *pro rata* with general creditors? He is clearly entitled to a priority and preference. The effect would be the same to the creditors, if, instead of procuring outstanding policies to be cancelled upon the terms prescribed, the receivers had caused reinsurances to be made according to the ninth section of the act of the 18th January, 1836. Under this last act, they must pay the premiums for such reassurance out of the assets of the company. In all probability, this would not have diminished the assets any the less; and the course here pointed out for cancelling policies by substituting others in their place, where the holders consent to receive them or, when such holders refuse, to enable receivers to obtain an indemnity against the loss of the assets which come to their hands by means of such continuing risks and outstanding contracts of the company, appears to me to be founded upon the same principle, namely, that of accelerating the settlement of the affairs of insolvent insurance companies and, necessarily too, at some expense to the funds of such companies. Consequently, the policy-holders who have, by mutual consent or arrangement with the receivers, given up or cancelled their contracts of insurance. are entitled to a return of premium out of the assets as a part of the expense to which such assets are subjected before dividend or distribution among the creditors.

I shall decree that the receivers hand over to the stockholders the amount of the unpaid dividend declared on the tenth day of November and payable on the first of December, one thousand eight hundred and thirty-five; and to the policy-holders, such portion of the premium as remained unearned at the time of cancelling their respective policies. The complainant is likewise entitled to his costs of this suit out of the assets of the company.