In Re Gubelman, Ex parte First National Bank of Trinidad, 13 F.(2d) 732, handed down to-day, we decided the drawer, having taken up a draft drawn under the same "service contract," stood in the position of an equitable assignee. It is true that this depended upon the drawer's subrogation to the holder's right, but the facts were not the same as here. There it appeared that before bankruptcy, the drawee had received the bankrupts' advice and had actually transferred the credit to the account of the draft. Here it appears only that the bankrupts had mailed the advice, and it does not even appear that they had an adequate balance with the drawee at that time or later. We are not called on to decide whether these are vital distinctions, because the case at bar was not argued on any such theory.

---

## In re GUBELMAN et al.

### Ex parte FIRST NAT. BANK OF TRINIDAD.

(Circuit Court of Appeals, Second Circuit. July 6, 1926.)

No. 155.

**1. Assignments ⬤�ネ49.**

Check or draft is not an assignment of funds on deposit with drawee.

**2. Evidence ⬤�네383(8).**

Entries on bankers' books are not conclusive evidence of a completed transaction.

**3. Bankruptcy ⬤⟺345—New York bank's foreign correspondent's transfer of credit held an appropriation pro tanto of fund to pay draft, entitling drawer of draft to preferred claim against New York bank after dishonor of draft and reversal of credits due to bankruptcy of New York bank.**

Where foreign correspondent of New York bank, after being directed to pay draft drawn on it by inland bank pursuant to a "drawing service," transferred amount of draft from New York bank's account to a draft payable account, but, due to intervening bankruptcy of New York bank, thereafter refused payment of draft, reversed the charge on its books, and remitted to receiver, held, actual transfer of credits operated as final appropriation pro tanto, creating fund which drawee was obliged to devote to payment of draft, and inland bank, drawer of draft, was entitled to preferred claim against bankrupt estate of New York bank, notwithstanding practice of reversing credits when drafts were no longer outstanding.

**4. Bankruptcy ⬤⟺345.**

As respects priority, inland bank's rights against bankrupt New York bank on account of dishonored draft drawn on New York bank's correspondent held not affected by want of proof of foreign law governing effect of transfer of credits by correspondent drawee.

Petition to Revise and Appeal from Order of the District Court of the United States for the Southern District of New York.

In the matter of the bankruptcy of Oscar L. Gubelman and others; Middleton S. Borland, trustee. The claim of the First National Bank of Trinidad was denied priority by order of the District Court, and claimant petitions to revise and appeals. Order reversed and cause remanded, with instructions.

See, also, 6 F.(2d) 1020; 9 F.(2d) 486; 9 F.(2d) 1017; 10 F.(2d) 926; 10 F.(2d) 935; 13 F.(2d) 730.

The bankrupts were international bankers, doing business in the city of New York. A part of their business consisted in making contracts with country banks, by which such banks might, with certainty that they would be honored, sell drafts to their customers, drawn upon foreign banks, correspondents of the bankrupts. These contracts read as follows:

In accordance with such a contract, the petitioner, a country bank, on May 19, 1923, drew upon the Sassari branch of the Banca Commerciale Italiana for 24,360 lire in favor of one Zara Sanna Giovanni. On the same day it advised the bankrupts of the draft in the following language, which the bankrupts had prescribed in the forms accompanying the contract:

"Pursuant to the terms and conditions governing your drawing service, we have sold draft bearing the above number, dated Trinidad, Colorado, May 19, 1923, for Lir. 24,360, and shall thank you to protect same upon presentation. We remit herewith the sum of $1,191.20."

This advice was accompanied by a check covering the draft in question and another. The bankrupts cashed the check and on the 22d wrote to the drawee as follows: "Please protect to the debit of our account the drafts as per particulars." Among such particulars were several drafts drawn upon the drawee's Sassari branch, including by specific description the draft in question.

The bankrupts had on deposit with the drawee funds sufficient to cover the drafts so advised, against which the drawee debited the drafts and stopped interest upon the amount so debited. It made a corresponding credit at the same time in an account entitled "Drafts Payable." Both entries were made before petition filed, and were in accordance with a standing agreement between the bankrupts and the drawee.

The draft was presented for payment after petition filed, and was dishonored. Thereafter the receiver procured from the drawee a reversal of the charge on its books against the bankrupts, of the credit in favor of the draft in the account "Drafts Payable," and a remittance of the restored deposit. The petitioner, as drawer, was compelled to take up the draft after dishonor, and now presents its claim as a preferred creditor, on the ground, among others, that the holder of the draft had become an equitable assignee of the bankrupts' deposit with the drawee. The trustee, who succeeded below, admits the right of the petitioner as general creditor, but denies the priority.

The trustee also relied upon a custom which obtained in business done under such an arrangement. If the correspondent of the foreign drawee wished to cancel a draft, he might so advise the drawee, who would thereupon reverse the credits and remit the deposit or make such other disposition as was directed. The correspondent might be himself the drawer, or have the relation to the draft of the bankrupts. The only instances of the practice known to the witnesses were those in which the draft had been already canceled, or at least when it was not outstanding in the hands of a holder in due course.

O'Brien, Boardman, Parker & Fox, of New York City (William D. Manice, Allen R. Memhard, and George Trosk, all of New York City, of counsel), for petitioner appellant.

Rosenberg & Ball, of New York City (Godfrey Goldmark, George G. Ernst, and Ralph F. Colin, all of New York City, of counsel), for appellee trustee.

Claude Dore, of Brooklyn, N. Y. (Logan Hay, of Springfield, Ill., and Sidney Wetmore Davidson, of New York City, of counsel), amici curiæ, for parties similarly interested.

Before ROGERS, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). It does not seem necessary to us to decide whether the bankrupts remained liable upon the draft after they had posted the advice to the drawee and the drawee had made the necessary entries on its books. Even if they did so remain, they could so finally and completely devote a part of their balance with the drawee to the payment of the draft as to create themselves constructive trustees pro tanto for the benefit of the holder, and disable themselves thereafter from recalling what they had done. Performance once executed was irrevocable, because there was no intimation of any right to revoke it, and because the continued liability of the bankrupts was not an equivalent of performance, as the event proved. An obligee is not exposed to the renewed hazard of performance, once the obligor has performed, nor may the obligor at his whim undo that which he once did in satisfaction of his promise. For the moment we reserve any difference which the supposed custom might create.

It is, however, proper to observe that if, as we think, the bankrupts did not remain liable after performance, their action in advising the drawee to transfer the credits was more plainly a final appropriation of the deposit than it would otherwise have been. On such a view, by those acts they had acquitted themselves of all their obligations, and certainly the contract intended that they should

secure payment of the draft. If they secured it at all, it must have been when they did the last necessary act. As a make-weight, therefore, we give our reasons for saying that the limit of their obligation was to secure the entries upon the drawee's books. If they had meant to become guarantors, the relation and the word were familiar enough, and it seems to us incredible that they should not have said so more unequivocally. Instead, they used language which cannot by any stretch be confused with a guaranty; their only undertaking was to advise the drawee, and to put him in funds. They expressly limited their employment "merely as agents of the drawees" for these purposes. Again, on the cover of the form book which the trustee at least insists was a part of the contract, these were said to be their "sole function." How it can be thought that the bankrupts remained any longer liable, once the drawee set up the credit in favor of the holder, we cannot understand. That was the whole of their stipulated performance, and there is no room for implications.

The trustee replies by insisting upon the language of the drawer's advice when remitting the covering funds: "We shall thank you to protect" the draft. Although that phrase was selected by the bankrupts, it will not serve to avoid the contract itself. "Protect" may indeed in other contexts mean "guarantee," but not in this. We are to make the whole language read consistently, and, if "protect" means "guarantee," the "mere employment" as, and the "sole function" of, a remitting agent, must be consistent with assuming absolute responsibility for the payment of the draft. Certainly they are not. On the other hand, it does not wrench the word to say that the drafts are protected when the drawees are put in funds. We have no evidence that the bankrupts' profit was adequate for any larger responsibility; but, if it was, none was assumed.

[1] With this conclusion as a background, we have to consider whether the contract and the action under it created an equitable assignment. It is, of course, true that a check or draft is not an assignment of funds on deposit with the drawee, though there is respectable authority to the contrary. It is not entirely clear why, on principle, the holder should not be allowed to sue upon the drawee's general promise to the drawer to honor his orders. Perhaps, as Mr. Williston says (Williston on Contracts, § 389), closely considered, the drawee is only the drawer's agent to pay; yet, even so, the promise of an agent is as binding as any one's else, and it seems rather hard to escape the conclusion that the drawee has promised to honor drafts so long as he remains in funds. For whatever reasons courts have gone far to find indications in such cases of an independent agreement to assign an interest in the funds. The most conspicuous case was Fourth Street Bank v. Yardley, 165 U. S. 634, 17 S. Ct. 439, 41 L. Ed. 855, where the agreement was spelled out from circumstances far less cogent than those at bar. Similar instances are Farley v. Turner, 26 L. J. Chan. 710; Burns v. Carvalho, 4 Mylne & Craig, 690; Coates v. First National Banks, 91 N. Y. 20; Muller v. Kling, 209 N. Y. 239, 103 N. E. 138; In re Hollins, 215 F. 41, 131 C. C. A. 349, L. R. A. 1915B, 438 (C. C. A. 2).

The rule is but an illustration of the general principle that an executory agreement may create such a right, if it plainly enough indicates a purpose to appropriate specific property for the payment of a debt. Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865. Ingersoll v. Coran, 211 U. S. 335, 29 S. Ct. 92, 53 L. Ed. 208; Hurley v. Atchison, etc., R. R., 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729; Parlin, etc., Co. v. Moulden, 228 F. 111, 142 C. C. A. 517, L. R. A. 1917B, 130 (C. C. A. 5); Curtis v. Walpole, etc., Co., 218 F. 145, 134 C. C. A. 140 (C. C. A. 1). As in the case of a trust, with which it is closely allied, the intent depends upon the form of the transaction and is necessarily subject to no exact test. Steel Cities Chem. Co. v. Va.-Car. Chem. Co., 7 F.(2d) 280 (C. C. A. 2); Rogers Locomotive Works v. Kelley, 88 N. Y. 234.

[2, 3] The contract in the case at bar clearly contemplated a final appropriation of the deposit, for the benefit of the holder of the draft. The phrase "transfer of credit" could only have meant a cancellation of the bankrupts' interest in their balance and an establishment of a corresponding credit in favor of the holders of the drafts. The action taken by the drawee was, prima facie, at any rate, consistent only with that purpose. We are, of course, aware that entries upon bankers' books are not conclusive evidence of a completed transaction. In re Gubelman (Ex parte Latzko & Popper) (C. C. A.) 10 F.(2d) 926 (C. C. A. 2). But they are none the less probative. If the bankrupts had had no balance with the drawee, but had remitted funds specifically to cover the draft, we can hardly suppose that it would be argued that these were not specifically attributed to the benefit of the holders, and available to them. Yet

the contract treats that situation as an alternative to the transfer of credit. It cannot be that what was a final appropriation in one case was not in the other. Therefore it seems to us that the agreement to transfer the credit, followed by its actual transfer, provided a fund which the drawee was obliged to devote to the payment of the draft; that is, that it created an equitable assignment or an irrevocable declaration of trust by the bankrupts.

The cases relied on by the trustee are not controlling. In Eastman Kodak Co. v. National Park Bank (D. C.) 231 F. 320, and 247 F. 1002, 159 C. C. A. 662 (C. C. A. 2), the drawee had not transferred the credits, and, so far as appeared, remained free to pay the drafts in the order of their presentation. Mere notice by the drawer does not establish a priority upon the fund in favor of the drafts advised. It is a vital difference when the drawee by specific credits provides for specific drafts. These must then be paid, no matter how many others come in before them, and that implies a final appropriation pro tanto. Our decision in Re Interborough Consolidated Corp., 288 F. 334, 32 A. L. R. 932, is quite remote. There the mortgagor did not establish a credit on which the bondholders might draw, but drew checks itself to pay the coupons.

More nearly akin is Noyes v. First National Bank, 180 App. Div. 162, 167 N. Y. S. 288, affirmed 224 N. Y. 542, 120 N. E. 870, where the bondholders presented their coupons direct to the disbursing agent, who paid them itself. However, the funds were not credited to the bondholders on the books of the agent. On the contrary, we think that they were credited, perhaps somewhat ambiguously, as an account of the debtor, though for its convenience the ultimate destination of the money appeared in the title. In the first place, we are not prepared to agree that there is no difference between a payment made by the debtor at its agent's office and a payment made by the drawee of a draft. But, even if there be none, there is a wide distinction between an account of the debtor, however tagged or earmarked, and a transfer of credit from the debtor to the creditor. Erb v. Banco di Napoli (May 25, 1926) 243 N. Y. 45, 152 N. E. 460, adds nothing to Noyes' Case.

The law in New York apparently is otherwise in respect of dividends. Le Roy v. Globe Ins. Co., 2 Edw. Ch. 657; In re Le Blanc, 14 Hun, 8, affirmed 75 N. Y. 598; In re Interborough Consolidated Corp. (D. C.) 267 F. 914. The distinction is not very clear, because a dividend, once declared, is a debt; and unless the later cases have overruled the earlier, it is only fair to say that Noyes' Case must be regarded as close to the line.

There remains the question of custom. The evidence went no further than to show a practice of reversing the credits when the draft was canceled. That was natural enough, but it is quite another thing to do so while the draft is outstanding. A custom which should allow the rights of a holder to be so changed, once they had become fixed in accordance with contracts made in his interest, ought to be proved by the most cogent evidence, if it could be valid at all. There was not even an intimation that it went so far.

[4] The last point is that, in the absence of any proof of Italian law, we cannot say what was the legal consequence of the entries made by the drawee in Italy. If the case involved the holder's rights against the drawee upon the deposit, that might be true; but it does not. The question is whether the bankrupts made themselves constructive trustees of their claim against the drawee; that question depends upon the law of the place where the supposed trustees acted. We cannot regard the making of the entries as the declaration of trust, even though without them the appropriation would have been incomplete. The bankrupts' fiduciary relation to the deposit was created by the contract, and by their appropriation of their funds to the benefit of the holder. These took place here. The drawee's compliance with their orders was at most only a condition, and the law of the place where the condition was fulfilled did not determine the effect of the declaration, but the law of the place where the declaration itself was made.

In view of the foregoing discussion, it is unnecessary to consider the petitioner's first point; i. e., whether the bankrupts originally received the petitioner's check in a fiduciary capacity.

The order is reversed, and the cause is remanded, with instructions to grant the petitioner a priority in its claim.

ROGERS, Circuit Judge, because of illness, has been unable to take part in this decision.