**FEE–CRAYTON HARDWOOD CO. v. RICHARDSON–WARREN CO. et al.**

District Court, W. D. Louisiana, Monroe Division. February 8, 1927.

No. 210.

1. **Bankruptcy ⬥18½—Bankruptcy of corporation a year after receivers took possession of its property did not divest equity court of jurisdiction to determine lien claims.**

Where insolvent corporation was adjudged a voluntary bankrupt over a year after its property was taken possession of by receivers and reduced to money, jurisdiction of equity court to determine and pay claims of creditors supported by liens and privileges on property was not divested, but balance remaining after payment of such claims should be delivered to bankruptcy court for distribution among general creditors.

2. **Jury ⬥28(12)—Claimant presenting claim for death of employee of insolvent corporation's receiver to special master waived jury.**

Where claimant for death of employee occurring in course of his employment by insolvent corporation's receiver was authorized by court to sue receiver, instead of bringing action at law as contemplated by court's authorization, presented claim to special master, she thereby waived jury and consented to have master determine claim.

3. **Receivers ⬥149—Labor lien claimants, failing to assert claims before special master, held not entitled to assert claims on exception to confirmation of master's report.**

Labor lien claimants against assets of insolvent corporation, who failed to assert their claims before special master as directed in order of reference, held not entitled to assert such claims on exception to report of special master as grounds for refusing to confirm report which failed to recognize them.

4. **Courts ⬥335(4)—Equity power of federal court cannot be controlled by state law, and court may recognize validity of equitable lien invalid under state law.**

Equity power of federal court asserted in suit of which court has jurisdiction arises under the federal Constitution and cannot be controlled or affected by state law, and federal court has power to determine validity of equitable lien, irrespective of validity of such liens under state law, which recognizes only liens created by statute.

5. **Liens ⬥7—Contract held to give exclusive selling agent of insolvent corporation's lumber output equitable lien for advances on lumber in mill yard.**

Under contract making complainant exclusive selling agent of entire output of insolvent corporation's sawmill, and providing that money to operate mill should be advanced by corporation on invoices of lumber placed in yards as drafts were drawn to be shipped on orders from complainant, and that complainant should have lien for advances, held, that complainant had equitable lien on lumber placed in mill yard up to date of ending of contract, notwithstanding contract did not amount to pledge or chattel mortgage under state law.

6. **Landlord and tenant ⬥246(3)—Lease held to create lessor's lien and pledge on all property on premises belonging to any one except sublessee, for rent due or to become due (Civ. Code La. arts. 2705-2707).**

Under Civ. Code La. arts. 2705-2707, lease for five years at specified monthly rental created a lessor's lien and pledge for rent due or to become due on all property then or subsequently placed on premises, including that of lessee's assigns or third persons, except sublessees, regardless of who might be primarily responsible for rent.

7. **Receivers ⬥77(1)—Receivers of lessee's assign could not, by repudiating lease, destroy lessor's lien (Civ. Code La. arts. 2705-2707).**

Even if receivers of lessee's insolvent corporate assign had right to repudiate lease, they could not destroy lessor's lien against property on premises under Civ. Code La. arts. 2705-2707; rights acquired by lessor against purchaser at receiver's sale being merely additional to those against property.

8. **Receivers ⬥148—On liquidation of insolvent transferee of lease, lessor held entitled to full payment of matured rent and discount of future rents at reasonable rate, accounting for any revenue received (Civ. Code La. arts. 2705-2707).**

Notwithstanding lease did not provide that failure to pay any installment should mature

balance of unpaid rent, *held* that, in view of Civ. Code La. arts. 2705–2707, lessor was entitled on liquidation of insolvent corporate transferee of original lessee to be paid in full as to matured claims and to have future rents discounted at reasonable rate, accounting for any revenue received on leasing property and being required to subrogate receivers to all her rights against purchaser of lease at receiver's sale, unless she abrogates lease.

9. **Chattel mortgages ☞138(3)—Landlord and tenant ☞248(1)—Lessor's lien is superior to vendor's lien and to subsequently recorded chattel mortgage (Civ. Code La. arts. 2705–2707, 3263; Act La. No. 198 of 1918).**

Under Act La. No. 198 of 1918, and Civ. Code La. art. 3263, lessor's lien against property on leased premises under articles 2705–2707 is superior to vendor's lien and to subsequently recorded chattel mortgage.

In Equity. Suit by the Fee-Crayton Hardwood Company against the Richardson-Warren Company and others, in which Mrs. Mary L. Millsaps and others intervened. Decree in accordance with opinion.

John M. Munholland, of Monroe, La., for complainant.

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, La., for respondents.

DAWKINS, District Judge. This cause originated with a bill of complaint by Fee-Crayton Hardwood Company, filed October 10, 1924, claiming an equitable lien upon lumber on the mill yard of the respondent, Richardson-Warren Company, Inc., coupled with a writ of sequestration. A former partnership bearing the same name and the individual members thereof were made parties defendant. Subsequently, on November 22d, two receivers were, without contest, appointed; the first, J. F. Wynn, being directed to market the lumber upon the yards, and the second, J. A. Hemler, to take charge of the sawmill and other property. On the same day, November 22, 1924, complainant filed an amended bill, claiming a chattel mortgage upon all of the sawmill property. Under orders regularly entered, Wynn proceeded to market the lumber, and Hemler, on June 30, 1925, sold the mill, machinery, and appurtenances for cash. On May 25, 1925, five days before the sale, Mrs. Mary L. Millsaps intervened, claiming a lessor's lien and privilege upon all the property, lumber, mill, etc., under a lease made with one W. B. Warren in the latter part of 1923, to cover a period of five years, and embracing the land upon which the mill plant and lumber were situated. Other claims were presented, and, the two receivers having filed their final accounts, the entire matter was referred to a special master, whose report was

filed in this court September 27, 1926. Certain objections and exceptions have been made thereto which will be considered in regular order.

The master reports that the only claims pressed before him, or upon which evidence was offered, were: (1) That of Elizabeth Ellis for the death of her husband, alleged to have been killed in the course of his employment by the receiver, J. F. Wynn; (2) that of Mrs. Mary L. Millsaps for rent on the mill site; and (3) the claim of complainant, Fee-Crayton Hardwood Company, and its assignee, the American-Southern Trust Company.

The master recommends that the claim of Elizabeth Ellis be rejected, for want of sufficient proof to sustain it; that Mrs. Millsaps be paid the full amount of her claim, less certain credits, with recognition of her privilege and pledge as lessor upon the lumber, mill, etc., but subordinate to the claim of complainant upon a note for $1,166, representing a part of the purchase price of the mill property, but that the claim of complainants to an equitable lien upon the lumber be denied; that the said vendor's lien and a subsequent chattel mortgage upon the mill property be sustained, subject to the prior claim for rent; that the proceeds of the mill, machinery, etc., other than the lumber, after payment of the vendor's lien of $1,166, be applied, together with a sufficient amount arising from sale of the lumber, to pay the rent claim of Mrs. Millsaps; and that the balance, if any, of funds from sale of the mill and machinery be attributed to the chattel mortgage of complainant. Otherwise the master recommended that the claim of complainant be recognized as an ordinary debt of the corporation.

On October 4, 1926, the lessor moved to confirm the report of the master and that she be paid the amount of her rent. At the same time there was filed by the Richland Parish State Bank, and some 30-odd other individuals, firms, and corporations, a joint appearance, styled "Intervention and Opposition to the Report of the Special Master," in which they alleged themselves to be creditors and that "on the ———— day of ————, 1926," the Richardson-Warren Company, Inc., was adjudged a bankrupt. They prayed that the recommendation of the special master be amended and supplemented, so as to specifically enumerate what property the chattel mortgage (of complainant) is to be recognized upon and what proceeds are to be paid out in satisfaction thereof, and further that it be shown what costs are to be borne by the two receivers and what property said costs are to

be satisfied from, that all funds be turned over to the bankrupt court, to be distributed according to the rank and privilege of all creditors as finally proven therein, and that the referee be given full power to proceed in said bankruptcy. These claimants did not appear before the master, but had previously joined in a rule, along with numerous other creditors, filed on January 16, 1925, to have the receivers dismissed, a new one appointed, and to have the latter authorized to operate the plant as a going concern.

October 9, 1926, exceptions to the report of the special master were filed by complainant, the details of which will be discussed hereafter. On October 18, 1926, exceptions and objections by John W. Martin et al. to the report of the special master were also filed. This was a joint motion of 100 persons, in which they likewise set up the fact that the Richardson-Warren Company, Inc., had been adjudged a bankrupt; that the master had recommended that the chattel mortgage of complainant be satisfied out of the proceeds of property of the corporation, "but fails to find that there was quite a lot of property of the Richardson-Warren Company, Inc., sold by the two receivers appointed in this case, on which there was no chattel mortgage resting"; that said report further "fails to find that there was one item of approximately 500,000 feet of lumber, a special account of which was kept by the receiver, there was no chattel mortgage resting against the same and further that no advance of money had been made on this item by the Fee-Crayton Hardwood Company," and that the said master further fails to find that the above petitioners are creditors of the defendant Richardson-Warren Company, Inc., with a lien for labor, and that their claims are entitled to be paid by preference and priority over all other creditors out of the proceeds of the sale of lumber which was sold by the receiver, J. F. Wynn.

There was also filed on November 18, 1926, an appearance by the "defendant in the above-entitled cause," in which it prayed that it "be allowed exceptions on the following findings of facts and conclusions of law of M. C. Redmond, special master." In substance, the exception alleges that the chattel mortgage of complainant did not sufficiently describe the property mortgaged to identify it, and should therefore be rejected. Defendant further urged a "general exception to the report of the master, in that it is against the law, against the facts, and against the weight of evidence."

[1] I think it proper to first dispose of the issue raised by the two sets of creditors above referred to, that the respondent corporation, Richardson-Warren Co., Inc., had been adjudged bankrupt and its effect upon this proceeding. After the receivers had been in charge for more than a year of the property of the corporation, and the same had been reduced to money, the latter was adjudged a voluntary bankrupt. An effort was then made to have the receivers turn over these funds to the bankrupt court, but this was denied, for the reason the court was of the view that, since more than four months had elapsed from the taking charge by the receivers of the property under alleged liens and privileges, its jurisdiction in equity could not be divested; that it could proceed to determine and pay such claims of creditors as were supported by liens and privileges upon the property, and, if anything remained thereafter, the same could be turned over to the bankrupt court for distribution among the general creditors. In the meantime, the proceedings in bankruptcy were stayed until this could be done. No attempt was made to have the ruling reviewed by the appellate court. I am still, therefore, of the view that this court should proceed in the manner indicated, and that the suggestion of intervening bankruptcy made in the appearance of the creditors cannot affect this course. High on Receivers (4th Ed.) § 51 et seq.; Foster's Federal Practice (6th Ed.) § 52.

[2] With respect to the claim of Elizabeth Ellis for the death of her husband, authority was granted by the court to her to sue the receiver. It was contemplated this would be done by an action at law. However, she chose to present her claim before the master, thereby waiving the jury and consenting to have it passed upon in this manner. High on Receivers (4th Ed.) § 254b, p. 299. The master found that she failed to support her claim with sufficient proof. An examination of the evidence leads me to concur in that finding.

[3] With respect to the claims of John H. Martin and others, alleging liens upon the lumber, etc., for labor, they do not appear to have been asserted before the master, as was directed in the order of reference, and no evidence has been offered in support thereof. In so far as I have been able to find in the record, their exception to the report of the master is the first time these claims have been made. It was their duty to file and support their claims with proof before the master, and, having failed to do so, the same cannot be set up in this form as a ground for refus-

ing to confirm the report which failed to recognize them. Full opportunity having been afforded, and no suggestion appearing even in their present pleading that the matter be sent back to the master for further proof, the exceptions will be overruled.

Taking up the case of complainants, they rely for the support of their claim to an equitable lien on the lumber upon the following facts:

On the 5th day of January, 1924, Fee-Crayton Hardwood Company entered into a written contract with Richardson-Warren Company, a commercial partnership, which was then operating a sawmill property at Crew Lake in Richland parish. That contract reads as follows:

"This contract and agreement, made and entered into by and between Richardson-Warren Company, a commercial partnership composed of H. Richardson, W. B. Warren, and R. S. Swetman, all residents of Rayville, Richland parish, Louisiana, hereinafter styled party of the first part, and Fee-Crayton Hardwood Company, a corporation organized under the laws of the state of Arkansas, with its domicile and place of business at Little Rock, in said state, and represented herein by Bert S. Nixon, hereinafter styled party of the second part, witnesseth:

"The party of the first part, herein represented by H. Richardson, hereby appoints party of the second part, herein represented by Bert S. Nixon, as its exclusive selling agent for the entire output of the lumber from its sawmill located at Crew Lake, Richland parish, Louisiana, under the following terms and conditions, to wit:

"(1) This contract is to exist for a period of 12 months from January 1st, 1924, provided that the party of the first part shall fill, under the terms and conditions of this contract, all orders, taken during the term hereof by the party of the second part under this contract, which remain unfilled on December 31, 1924.

"(2) Party of the second part agrees to advance money to party of the first part only as specified in this paragraph, to wit, twenty-five ($25.00) dollars per thousand board feet on all tupelo gum or cypress lumber; thirty ($30.00) dollars per thousand board feet on sap and red gum lumber and thirty-five ($35.-00) dollars per thousand board feet on oak or ash lumber; measurements less than one inch in thickness in proportion to foregoing stated amounts. All of said lumber to run No. 2 common and better, and not to exceed 20 per cent. of it is to be No. 2 common. All lumber

to be uniformly manufactured full thickness when dry, edged, and end trimmed, and to be manufactured from first-class, fresh-cut, live, merchantable timber, and to be free from punky, doty, brashy, or light weight lumber, or lumber damaged by overflow or high water; lumber to be piled on yards of party of first part at Crew Lake, Louisiana, on the V., S. & P. Railroad.

"(3) Party of the first part agrees to place the lumber on foundations sufficiently high to permit a good air space, or end racked so as to permit a good air space; all lumber stacked on foundations shall have not less than seven cross-sticks on 16-foot piles, six cross-sticks on 14-foot piles and five cross-sticks on 12-foot piles; 60 per cent. or more of said lumber shall run 14 and 15 feet long.

"(4) Party of the first part agrees to allow the lumber to remain in pile until dry and to load and ship only in accordance with instructions of party of the second part, guaranteeing the grades and measurements according to the National Hardwood Lumber Association rules.

"(5) Party of the second part agrees to advance to party of the first part every two weeks, the sums set forth in paragraph two (2) of this contract, upon party of the first part furnishing to party of the second part a daily report of all lumber cut and placed on sticks; party of the second part agrees to honor the draft of the party of the first part every two weeks, to which draft shall be attached a biweekly report of all lumber so cut and stacked, which said biweekly report shall conform in all respects to the aggregate of the daily reports for same period.

"(6) Party of the first part agrees to lease, by a written lease in proper form with usual covenants and duly executed, to party of the second part, for the period of this contract, the land upon which the said lumber is to be stacked.

"(7) Party of the first part is to execute to and in favor of the party of the second part a good and solvent bond with surety by a company or companies, or any other security acceptable to the party of the second part, and in an acceptable amount, guaranteeing to party of the second part that the lumber at time draft is made for same is free from all liens and claims of every description including taxes and labor; that the daily and biweekly reports of lumber cut and placed for which drafts are drawn, are true and correct; and that the party of the first part will ship or dispose of said lumber only in accordance with the terms of this contract.

"(8) Party of the first part agrees to insure all lumber manufactured by it under this contract, with some company or companies and for an amount acceptable to the party of the second part, with a clause or indorsement on the policy or policies of said insurance, making any loss thereunder payable to the party of the second part as its interest may appear; said policy or policies shall be delivered to the party of the second part immediately upon their issuance and in event of loss by fire, the party of the second part shall receive its cash advances on said lumber, if any, together with its commission on all lumber on which cash advances have been made.

"(9) In consideration of its appointment as exclusive selling agent of the party of the first part, the party of the second part agrees to pay the party of the first part the highest market price which said party of the second part· can secure, at the time of sale, from the sale of said lumber, less 10 per cent. commission on the net selling price, after deducting from the invoice the tariff rate of freight at time of shipment. The party of the second part will guarantee all credits which it may extend to its customers and the party of the first part agrees to relieve party of the second part from all liability on account of cancellation of orders made by customers of party of the second part.

"(10) Party of the second part agrees to submit to party of the first part for its approval the price to be received on each order to be delivered from lumber manufactured under this contract, where said price is below the market price prevailing at the time of said order.

"(11) Party of the second part shall have the privilege at any time of rechecking the lumber on the yard and/or of inspecting the yard inventory and shipping books of party of the first part.

"(12) Party of the second part agrees to make the advances referred to in paragraph two (2) of this contract at the rate of 6 per centum per annum.

"(13) It is understood and agreed by and between the parties hereto that all 'kicks' or 'complaints' on account of grade or shortage in measurement that aggregate not to exceed $5 per car are to be absorbed by party of the second part; but, where a complaint on account of grade or measurement exceeds $5 per car, party of the second part shall refer the complaint to the party of the first part for adjustment, and party of the first part shall pay all claims over $5 per car, whether settled by agreement or according to the rules of the National Hardwood Lumber Association.

"(14) It is further understood and agreed that the adjustment of all freight charges shall be finally made upon certified railroad weights, said certified railroad weight sheets or expense bills to be delivered to party of the first part for its inspection and approval.

"(15) Up to the time the total amount of advances made to it has been repaid, party of the first part agrees that party of the second part may credit its advance account with the face of the invoices less freight and commission. After the advance account has been fully repaid, party of the second part agrees to pay to party of the first part within ten days after receipt of each invoice, 80 per cent. of the full face value of said invoice, less freight charges and 10 per cent. commission, balance to be paid immediately upon receipt and acceptance of shipment by customer.

"(16) Party of the second part agrees that it will use its best efforts at all times to furnish to party of the first part orders and shipping instructions to cover all lumber on hand that is ready for shipment and shipping dry.

"(17) It is understood and agreed by and between the parties hereto that, if there is a slump in the lumber market whereby sales prices of lumber depreciate to a point where there is not 25 per cent. margin between mill sale price and amount of advance, they will agree on a new scale of advances, so that said margin will equal at least 25 per cent. and if, under the new scale of advances, there is an excess in the amount then advanced over the amount that will be required by said new scale, then the party of the first part will place sufficient lumber on the yard to absorb such excess.

"(18) It is further understood and agreed by and between the parties hereto that any breach or violation of any of the articles of this agreement by either of the parties hereto will have the effect of terminating this contract at the option of the aggrieved party, provided the aggrieved party shall give the other party thirty (30) days' notice in writing of its intention to terminate this contract and provided further that the party of the first part shall fill, under the terms of and conditions of this contract, all orders taken under this contract up to the date of its termination by the party of the second part and which remain unfilled at said date of termination.

"(19) The party of the second part shall at all times have a lien on the lumber on yard of party of the first part for any and all ad-

vances made by party of the second part to party of first part and which remain unpaid.

"(20). For and in consideration of the benefits to accrue to it by virtue of this contract, the party of the second part hereby accepts the hereinabove recited appointment as exclusive selling agent for party of the first part under all the terms and conditions and subject to all the obligations of this contract.

"Thus done and signed in duplicate by Harry Richardson, representing the Richardson-Warren Company, and by Bert S. Nixon, representing the Fee-Crayton Hardwood Company, in the presence of the two undersigned competent attesting witnesses, who hereunto sign their names, together with said parties, on this the 5th day of Jany., A. D. 1924."

Subsequently, in the early part of 1924, the sawmill business of the partnership was transferred to a corporation duly organized under the laws of Louisiana, one of the respondents herein, under the name of Richardson-Warren Company, Inc., and by resolution of its board of directors, dated the 17th day of April, 1924, the terms of said contract with Fee-Crayton Hardwood Company were adopted and made the obligation of the corporation, which action was approved and consented to by the complainants.

From this it is seen that there was a clear and definite understanding on the part of both parties that the money with which to operate the sawmill of the lumber company should be furnished by the complainant, and that *all* lumber so manufactured should be consecrated and applied to the payment of the advances so made. It is true that the contract amounted to neither a pledge nor the giving of a chattel mortgage under the Louisiana law, because there was no actual delivery to the pledgee or its agent to effect a pledge (although the contract bound the borrower to lease to Fee-Crayton Hardwood Company a part of its mill site as a place of deposit, and if done the complainant could easily have completed a pledge by taking possession of the lumber) ; nor did the terms of the contract conform to the requirements of a chattel mortgage under the law of the state. However, the absence of these legal remedies is the very basis of complainant's appeal to equity for relief—that is, it has no adequate remedy at law, and is seeking here to have applied those principles which consider as done that which should have been done under the contract and invokes the equity powers of this court for that purpose.

[4] Not only did the nature of the agreement and the conditions under which the money was

furnished—that is, upon invoices of lumber actually cut and placed upon the yards, as the drafts were drawn, and to be shipped upon orders from complainant—indicate that it was to secure the loans, but it was specifically stipulated that a lien upon the lumber should exist. Undoubtedly the law of Louisiana recognizes only those liens created by statute, but the equity powers of a federal court arise under the federal Constitution, and cannot be controlled or affected by the state law. Its remedies are available in any case over which it has jurisdiction, and there is no question but that the complainant was entitled to come into this forum on the ground of diverse citizenship. In the case of Neves v. Scott et al., 13 How. 272, 14 L. Ed. 140, the Supreme Court of the United States said:

"Wherever a case in equity may arise and be determined under the judicial power of the United States, the same principles of equity must be applied to it, and it is for the courts of the United States, and for this court in the last resort, to decide what those principles are, and to apply such of them to each particular case as they may find justly applicable thereto. These principles may make part of the law of a state, or they may have been modified by its legislation or usages, or they may never have existed in its jurisprudence. Instances of each kind may now be found in the several states. But in all the states the equity law, recognized by the Constitution and by acts of Congress, and modified by the latter, is administered by the courts of the United States, and upon appeal by this court. Such has long been the settled doctrine of this court, repeatedly and steadily affirmed in whatever form the question has been presented. In United States v. Howland, 4 Wheat. 115 [4 L. Ed. 526], Chief Justice Marshall said: 'As the courts of the Union have a chancery jurisdiction in every state, and the Judiciary Act confers the same chancery powers on all, and gives the same rule of decision, its jurisdiction in Massachusetts must be the same as in other states.' So Mr. Justice Story, in Boyle v. Zacharie et al., 6 Pet. 658 [8 L. Ed. 532], says: 'The chancery jurisdiction given by the Constitution and laws of the United States is the same in all the states of the Union, and the rules of decision are the same in all.' See, also, Robinson v. Campbell, 3 Wheat. 222 [4 L. Ed. 372]; Livingston v. Story, 9 Pet. 654 [9 L. Ed. 255]; Russell v. Southard, decided at the present term, and reported in 12 How. 139 [13 L. Ed. 927]."

See, also, Rose' Notes to U. S. Reports on the case of U. S. v. Howland, 4 Wheat. 108, 4 L. Ed. 526.

Again, in the case of Burdon Central Sugar Co. v. Ferris Sugar Mfg. Co. (C. C.) 78 F. 417 (which arose in Louisiana), Judge Parlange, sitting as a District Court, at page 421, said:

"That such a contract as the one now under consideration is valid, that it does not come under the operation of the statute forbidding the assignment or transfer of claims against the United States, and that such a contract creates a lien enforceable in chancery, are questions which have been settled for this circuit by the Circuit Court of Appeals in Barrow v. Milliken, 74 F. 612, 20 C. C. A. 559, on appeal from this court, 65 F. 888. I need hardly say that the fact that the law of the state would give no lien in such a case as this can in no manner affect the question of equitable liens. Barrow v. Milliken, supra, involved the question of the enforcement of an equitable lien when the state law gives no lien. The doctrine of equitable liens would never have come into existence if it were true that one who claims such a lien must first show a lien at law. Equitable liens became necessary precisely on account of the absence of similar remedies at law. 'An equitable lien is a right, not recognized at law, to have a fund or specific property, or the proceeds, applied in whole or in part to the payment of a particular debt or class of debts.' 13 Am. & Eng. Enc. Law, verbo 'Liens,' p. 608, and cases there cited. 'As equity has brought into existence liens unknown to the common law, it can enforce them by whatever means they will be rendered more efficacious of doing justice to the parties interested.' Id. p. 613, and cases there cited.

"The equity jurisdiction of federal courts is derived from the Constitution and laws of the United States, and their power and rules of decision are the same in all the states. Noonan v. Lee, 2 Black, 499 [17 L. Ed. 278]. The equity jurisdiction of the federal courts is independent of the local laws of any state. Justice Story, in Gordon v. Hobart, 2 Sumn. 401, Fed. Cas. No. 5,609. Equitable liens may be enforced in the federal courts, although no remedy is provided for the enforcement of such liens by the state jurisprudence in the state courts; and it has long been settled in the federal courts that the equity jurisdiction and equity jurisprudence administered in the courts of the United States are coincident and coextensive with that exercised in England, and are not regulated by the municipal jurisprudence of the particular state where the court sits. Justice Story, in Fletcher v. Morey (Fed. Cas. No. 4,864], supra, and cases there cited.

"In Riddle v. Hudgins [58 F. 490], supra, the Circuit Court of Appeals for the Eighth Circuit, passing on an express verbal agreement to give a lien, said, as already quoted: 'Nor do they (equitable liens) depend upon any statute for their force and efficacy, and they are not affected by the registration laws.' The court further said: 'The law gives no remedy by which such liens can be established and enforced. Being an equitable lien, the enforcement of it is exclusively within the province of a court of equity.' 'Equity,' says the Supreme Judicial Court of Massachusetts, 'furnishes the only means by which the property on which the charge is fastened can be reached and applied to the stipulated purpose (cases cited).'

"In Kirby v. Railroad, 120 U. S. 130, 7 S. Ct. 430 [30 L. Ed. 569] Justice Harlan, as the organ of the court, said: 'While the courts of the Union are required by the statutes creating them to accept as rules of decision, in trials at common law, the laws of the several states, except where the Constitution, laws, treaties, and statutes of the United States otherwise provide, their jurisdiction in equity cannot be impaired by the local statutes of the different states in which they sit. In U. S. v. Howland, 4 Wheat. 108, 115 [4 L. Ed. 526], Chief Justice Marshall, speaking for the court, said that as the courts of the Union have a chancery jurisdiction in every state, and the Judiciary Act confers the same chancery powers on all, and gives the same rule of decision, its jurisdiction must be the same in all the states.' The same view was expressed by Mr. Justice Curtis in his work on the Jurisdiction of the Courts of the United States (page 13), when he observed that 'the equity practice of the courts of the United States is the same everywhere in the United States, and they administer the same system of equity rules and equity jurisdiction throughout the whole United States, without regard to state laws.'

"So, in Payne v. Hook, 7 Wall. 425, 430 [19 L. Ed. 260] it was said: 'We have repeatedly held "that the jurisdiction of the courts of the United States over controversies between citizens of different states cannot be impaired by the laws of the states, which prescribe the modes of redress in their courts, or which regulate the distribution of their judicial power." If legal remedies are sometimes modified to suit the changes in the laws of the states, and the practice of their courts, it is not so with equitable. The equity jurisdiction of the courts of the United States is the same that the high court of chancery in England possesses, is subject to neither limitation

nor restraint by state legislation, and is uniform throughout the different states of the Union.' See, specially, Curt. Jur. U. S. Cts., pp. 13, 14, 212–215."

See, also, Kirby v. Lake Shore Railroad Co., 120 U. S. 130, 7 S. Ct. 430, 30 L. Ed. 569.

A case very similar to the one now under consideration arose in the Sixth Circuit, and is found reported in 207 F. 255, being that of Gage Lumber Co. v. McEldowney, on appeal to the Circuit Court of Appeals for that circuit. We quote from the statement of the case by the court as follows:

"This appeal presents an issue as to the ownership of two sums of money, one of $7,-485.16 and the other of $3,500.47. These sums are the proceeds of sale of certain lumber received by appellant at times and under circumstances which are claimed to differentiate its rights thereto, if, indeed, it is entitled to either sum. The issue as presented and determined below was made to depend upon whether the title to the lumber had passed from the bankrupt to the appellant prior to the bankruptcy. The District Judge believing that the title had not passed, entered an order in favor of the trustee (194 F. 181), and hence the appeal.

"The controversy grew out of a contract entered into at Providence, R. I., September 6, 1906, which, so far as it is claimed to have been in writing, was in the form of an order given by the L. H. Gage Lumber Company (hereinafter called the Gage Company) to and accepted by the Clairfield Lumber Company (hereinafter called the Clairfield Company); the former being a corporation of Rhode Island, with offices at Providence, and the latter a corporation of Kentucky, and then operating a sawmill at Clairfield, in Claiborne county, Tenn. The order so far as necessary to state was in this language: 'As per conversation of same date you will kindly enter our order as follows: [Specifically describing the lumber by quantities, dimensions, kinds, and prices per thousand feet.] * * * The above prices f. o. b. Clairfield, Tenn., guaranteed rate of 30½ cents to Boston points. * * * Inspection guaranteed on the rules of the National Hardwood Association now in force. We hereby agree to advance on account of said contract in four months paper $10,000, under date of October 1st, $10,000, and under date of November 1st, $10,000; you agreeing at the same time to have put on sticks during the month of September at least $10,000 worth of lumber to apply on our contract, and during the month of October at least $10,000 worth additional,

to apply on our contract. You also agree to have an additional $10,000 worth of lumber on sticks by December 1st, making a total of $30,000 worth of lumber which has been put on sticks to apply on our contract of this date. We hereby agree to pay half cash on each invoice as rendered, the balance to apply on the payment of notes given. The same shall continue in this manner until this said advance has been paid in full, after which your invoices will be paid in full.'

"The Gage Company gave its promissory notes, and they were duly paid. The Clairfield Company began shipping lumber to the Gage Company in October, 1906, and continued its shipments from time to time until September 9, 1907; 13 carloads having been shipped in 1906, and 140 in 1907. However, the lumber was not manufactured within the time specified, and the shipments were so delayed as to cause one of the representatives of the Gage Company to go to the mill in June, 1907, and also in July and September. Certain things were done at these times, which will be mentioned later. September 7, 1907, one of the creditors of the bankrupt filed a creditors' bill in the Claiborne chancery court, averring insolvency of the Clairfield Company, praying that a receiver be appointed, and that the assets of the company be administered for the benefit of its creditors.

"On the same date, involuntary proceedings in bankruptcy were begun in the court below against the Clairfield Company, all of which resulted in the appointment in the state court of a receiver, and in the court below of the appellee as trustee in bankruptcy, who came into possession of the property and assets of the bankrupt. Meanwhile the Gage Company began an action in the nature of replevin in such chancery court, setting up title to certain lumber then in possession of the receiver appointed by the state court in the yards of the bankrupt. Thereupon an adjustment was effected between the parties to this litigation, whereby the replevin suit was dismissed and an agreement made by which the claim of the Gage Company should be set up and litigated in the bankruptcy proceeding.

"Later the Gage Company filed a petition in intervention in the court below, stating in substance that the parties had agreed that upon execution of its bond petitioner might remove the lumber claimed by it and submit its claim to the property for the determination of the court below; that the bond had been filed; that on September 6, 1906, the written contract before set out was entered into; that

pursuant to that agreement petitioner advanced to the Clairfield Company the sum of $30,000, together with certain other sums, amounting in all to $41,091.05, against which advancements petitioner had received lumber (not including that now in controversy) to the amount of $24,851.32, leaving a balance due petitioner of $16,239.73; that prior to the filing of the creditors' bill in the Claiborne chancery court the Clairfield Company had manufactured expressly for petitioner under the terms of the agreement, and delivered to it 'by placing the same on sticks expressly for it under said contract,' certain lumber therein particularly described; that such lumber had been paid for and was the property of petitioner; that it was 'unlawfully taken in custody by the chancery court of Claiborne county, Tennessee; and that the trustee in bankruptcy has no right or title to the same.' The prayer was that petitioner be decreed to be the true and lawful owner of such lumber.

"Issue was joined by the answer of appellee; the agreement in effect to substitute a bond for the lumber in dispute and submit the issue for trial in the court below was admitted; counterclaim and set-off were alleged respecting the claim of petitioner for $16,239.73 for moneys advanced by petitioner to the Clairfield Company on purchases of lumber, and in excess of the sum due for lumber actually received; a preference was also averred through the transfer of seven carloads of lumber represented by the second sum of money in dispute in the present case; and praying that the various controversies between the parties be consolidated and heard together, that petitioner's claim, before mentioned, be re-examined and disallowed, unless petitioner should surrender the amount of such preference."

It was contended, first, that the Gage Company had under agreement acquired title to the lumber, and in the alternative that it had such an interest therein or lien thereon as to give it a right of priority for payment from the proceeds of the lumber in a controversy over the funds in the hands of the bankrupt court. In passing upon these questions, while the court held the Gage Company did not have title to the lumber, yet it sustained the equitable lien and in doing so, said:

"The nature of an equitable charge or lien, and the principles upon which the courts proceed in fastening such charges upon the objects intended as security, are so familiar that we are content to cite only a few of the leading decisions. In Hurley v. Atchison, Topeka & Santa Fé Ry. [213 U. S. 132, 29 S. Ct. 466, 53 L. Ed. 729], supra, a mining company had contracted to mine and deliver coal sufficient to meet the current needs of the railroad company, but through financial embarrassment was unable to do so; and in order to assist the mining company to keep its agreement, the railroad company furnished the mining company with money in advance of the agreed time of payment, and it was held that this implied (213 U. S. 134, 29 S. Ct. 466, 53 L. Ed. 729) 'a purpose that the coal as mined should be delivered, and is from an equitable standpoint to be considered as a pledge of the unmined coal to the extent of the advancement.'

"This was not because of the intervention of bankruptcy or of the trustee's continued performance of the parol agreement previously made between the mining company and the railroad company, as counsel for the Clairfield Company urge. It was in consequence and in recognition of the previous parol agreement. Justice Brewer there distinctly approved language of the Circuit Court of Appeals, which is pertinent here: 'The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to pledge (set apart) a sufficient amount of coal after it should be mined as security for the payment of advances made. This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it, and to treat it as creating an equitable charge or lien, however inartificially it may have been expressed.'

"See Walker v. Brown, 165 U. S. 654, 664, 17 S. Ct. 453, 41 L. Ed. 865; Ingersoll v. Coram, 211 U. S. 336, 368, 29 S. Ct. 92, 53 L. Ed. 208; Fourth Street Bank v. Yardley, 165 U. S. 634, 644, 17 S. Ct. 439, 41 L. Ed. 855; Ketchum v. St. Louis, 101 U. S. 306, 316, 25 L. Ed. 999; Barnard v. Norwich & Worcester Railroad Co., 4 Cliff. 351, 365, Fed. Cas. No. 1,007 (per Justice Clifford). See, also, Howard v. Delgado & Co., 121 F. 26, 57 C. C. A. 270 (C. C. A. 5th Cir.), and citations."

See, also, Coppard v. Martin, 15 F.(2d) 743 (C. C. A. 5th Cir.); Bank of Oakman v. Union Coal Co., 15 F.(2d) 360 (C. C. A. 5th Cir.).

[5] My conclusion is that complainant had and is entitled to have recognized an equitable lien upon the lumber manufactured and placed upon the yard of respondents under the terms of their contract up to the date of its ending on September 11, 1924, which was 30 days after the giving of notice as per its terms of August 11th.

Claim of Mrs. Mary L. Millsaps for Rent.

[6] On September 17, 1923, Mrs. Millsaps entered into a lease agreement with one William B. Warren (who was afterwards a member of respondent partnership and also a stockholder in the corporation subsequently formed), covering the land upon which the mill and lumber manufactured were situated at the time of the sequestration and subsequent appointment of the receivers. This lease described the land in detail and was duly recorded on September 29, 1923. As to the amount and terms of payment of the rent it provided as follows: "This lease is made for a period of five years, beginning January 1, 1924, and ending December 31, 1928. The rental price is to be $150 per month, payable monthly."

There was no inhibition against assignment of the lease or subletting of the property and either might have been done under the contract. The effect of the lease was to create a lessor's lien and pledge upon all of the property then situated thereon or that was subsequently placed upon the premises, except such as might belong to a sublessee. R. C. C. arts. 2705, 2706, 2707. In filing her intervention the lessor alleged that the respondent partnership and corporation were sublessees or assignees of the original lease to Warren, but the proof fails to show that there was any contract of sublease, either oral or written. In fact, both the partnership of Richardson-Warren Company as well as the corporation formed in the early part of 1924, continued to occupy the premises, to operate the mill and place lumber thereon just as if they had been the original lessees.

I am of the opinion that it makes little difference whether the matter be treated as a case where the lease was made by Warren for the use and benefit of the partnership and corporation subsequently formed or the parties be considered assignees in the absence of a subletting. The law of Louisiana gave the lessor a lien and pledge upon all the property found upon the land, including that of third persons, for the payment of her rent, whether due or to become due. C. P. art. 287; Goodrich v. Bodley, 35 La. Ann. 526; In re Scruggs (D. C.) 205 F. 673; Chemical Nat. Bank v. Hartford Deposit Co., 161 U. S., p. 1, 16 S. Ct. 439, 40 L. Ed. 595. See, also, Jacob v. Roussel, 156 La. 171, 100 So. 295.

This lien is a thing distinct from the primary obligation of the lessee or assignee to pay the rent, and may be asserted against the pledged property so long as it remains upon the premises, regardless of who may be primarily responsible for the rent. The lessor timely asserted her claim after the property had been taken into the hands of the court, through its receiver, and before portions at least of the lumber and mill property were sold, and before any distribution of the proceeds had been made.

[7] Granting that the receivers had the right to repudiate the lease, they could not destroy the lien, and such rights as were acquired by the lessor against the purchaser at the receiver's sale I think were merely additional to those which she enjoyed against the property. If the lessee, his assigns, or the owners of the property affected by the lien, could not take it off the premises or otherwise destroy the rights of the lessor without her consent, I do not see how this could be done by the receivers. To so hold would be to say that the mere filing of a bill of complaint and taking possession of the property by the receivers could have the effect of destroying an otherwise substantial right and lien under the state law. I do not think this can be done.

[8] The lease itself does not provide that the failure to pay any installment shall have the effect of maturing the balance of the unpaid rent; but, if judicial proceedings had not intervened, the lessor could have exacted that the security which she enjoyed continue to remain upon the premises until the discharge of all the obligations as they matured under the contract. The liquidation by the court of the affairs of the corporation and the converting of its assets to money has made this impossible, and I think the lessor is entitled to be paid the amount of her matured claim in full; but as to that to become due the same should be discounted at a reasonable rate, say 6 per cent. per annum. If the premises have been leased in the meantime, or she has received any revenue therefrom, this should be accounted for. She should likewise be required to transfer to and subrogate the receivers to all of her rights, if any, against the purchaser of the lease at the receiver's sale, unless she chooses to have the same abrogated

and to acquire possession of her property. The amount to be applied to the payment of the rent should be drawn from both funds in the hands of the two receivers in the proportion which the amount due bears to the sums in the possession of each.

[9] Neither the vendor's lien claimed by complainant, representing a portion of the purchase price of the mill property, nor the chattel mortgage given in lieu of the bond provided by the contract between the complainant and the respondents, can prime the rent claim. It is well settled that a lessor's lien is superior to that of the vendor (R. C. C. art. 3263), and since the lease was recorded on September 29, 1923, and the chattel mortgage on the 16th day of May, 1924, the latter must give way to the former, since it is only as to rights acquired subsequent to the chattel mortgage that the law makes it superior. See Act La. Leg. No. 198 of 1918.

The description of the property covered by the chattel mortgage of complainants, I think, is sufficient for identification, and the proof sustains the lien upon the mill, machinery, and appurtenances sold by Hemler, receiver.

In conclusion, there should be judgment as follows:

Mrs. Mary L. Millsaps, or her heirs, should have judgment for the amount of her rent claim, to the extent and subject to the conditions indicated hereinabove, as a first lien upon the funds in the hands of the two receivers, to be paid by preference over all others in the proportion which it bears to the respective amounts in the hands of each; that the complainant should have judgment recognizing its vendor's lien upon the funds in the hands of J. A. Hemler, receiver, to be paid after satisfaction of the rent claim; that the balance of the funds held by Hemler, receiver, should be applied upon the complainant's chattel mortgage; that it should have further judgment recognizing its equitable lien upon the lumber and its proceeds arising from the sale of all lumber manufactured and placed upon the yard up to the date of September 11, 1924; and that the remainder of the funds, if any, arising from the sale of the lumber manufactured and put upon the yard after September 11, 1924, less the payment of its proportion of the rent claim, should be turned over to the bankrupt court for distribution among general creditors having no lien upon the property or funds of respondent. Complainant will also be entitled to have, after application of available funds hereunder to the payment of its claim, a deficiency decree

for the balance of its claim against the corporation, the partnership and its individual members.

Costs of receivership of the lumber should be paid from the funds arising from the sale of the lumber and those of the receivership of the mill and other property should be paid from that source, while those incurred in the prosecution and liquidation of claims carrying liens recognized against both funds should be paid from each in the proportion which the said funds bear to the whole of such claims.

A decree in accordance with these conclusions may be presented.