HURLEY, TRUSTEE IN BANKRUPTCY OF THE ESTATE OF THE MOUNT CARMEL COAL COMPANY, BANKRUPT, APPELLANTS, *v.* THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 95. Argued January 26, 27, 1909.—Decided April 5, 1909.

*Coder* v. *Arts, post,* p. 223, followed as to the jurisdiction of this court of appeals from the Circuit Court of Appeals in bankruptcy proceedings, where the amount in controversy exceeds $2,000 and the question involved is one which might have been taken on writ of error from the highest court of a State to this court.

Equity looks at substance and not at form. An advance payment for coal yet to be mined may be a pledge on the coal and, in that event, as in this case, the trustee in bankruptcy takes the mine subject to the obligation to deliver the coal as mined to the extent of the advancement.

153 Fed. Rep. 503, affirmed.

THERE is practically no controversy in respect to the facts in this case. We take the following statement from the opinion of the Circuit Court of Appeals: In 1896 the Osage Carbon Company and the Cherokee and Pittsburg Coal and Mining Company, as parties of the first part, and Charles J. Devlin, as party of the second part, and the railway company as party of the third part, entered into an agreement whereby the parties of the first part leased to Devlin for a term of three years certain coal lands located in the State of Kansas, with the right to mine coal therefrom, and Delvin, the party of the second part, agreed

to sell and deliver to the railway company, and the latter to buy from him daily, all the coal required by it in the operation of certain of its lines of railroad in the State of Kansas at prices stated in the lease, payment to be made by the railway company on the 15th day of each month for all coal delivered to it during the preceding calendar month.   Power was conferred upon the railway company to terminate the lease for failure by Devlin to perform any of his undertakings, and the right to assign the lease was made, subject to the consent of the railway company.   Subsequently, Devlin duly assigned to the Mount Carmel Coal Company all his rights under the lease.   By two successive agreements this contract was extended until June, 1906.   All the parties continued in the performance of their respective obligations until July, 1905, when the Mount Carmel Company was adjudicated a bankrupt.   Receivers were appointed and authorized to conduct the business of the bankrupt in the usual course until trustees should be chosen.   The receivers and the subsequently appointed trustees successively continued to operate the mines under the orders of the court and to deliver the coal as required by the contract.   While the receivers were in charge the railway company and the two coal companies, the original lessors, filed their joint intervening petition, setting forth their relations to the bankrupt under the contract, their rights thereunder, as already stated, and, in substance, that by an agreement between them and the bankrupt the contract had been modified to the extent that the railway company had agreed that without waiting until the 15th day of the month to make its payment for coal theretofore purchased, it would, in order to accommodate the Mount Carmel Coal Company and enable it to pay off laborers and keep the mines going, make advance payments from time to time when necessary for those purposes.   In pursuance of that agreement and for the purposes stated it had advanced $57,304.16, with the understanding that it should be repaid by the subsequent delivery of coal; that the intervening bankruptcy proceedings of July 7 and the appointment of receivers by the

court alone prevented the bankrupt from carrying out its agreement and delivering the coal as required by the contract. The petitioners prayed that the lease be declared forfeited and void and the mines delivered back to them, or that the receivers be directed to deliver to the railway company the amount of coal so paid for in advance.

A referee, to whom the intervening petition was referred, reported unfavorably to the granting of any relief. His report was afterwards confirmed by the District Court and the petition dismissed. The referee found and reported that the amount claimed by the railway company was as stated in the intervening petition, and was advanced to enable the bankrupt to meet its pay rolls, but found that there was no testimony indicating an intention to modify the written lease. The District Court, in reviewing the action of the referee, said: "True, at the time the sums of money were advanced it was no doubt contemplated and agreed by the parties that the bankrupt would repay the money by furnishing the coal at the price of the coal measured in money by the terms of the contract and would furnish such coal in July and August, as claimed, but at the time of the failure of the bankrupt the coal remained in the ground unmined." Both the referee and the District Court found that the agreement for the advance of the money was a separate, independent, parol contract, and had nothing to do with the original written contract as shown by the lease, and that, being such an independent, parol contract, there was no lien upon any of the property for its payment.

The Circuit Court of Appeals, 82 C. C. A. 453, reversed the judgment of the District Court and held that that court should have directed a surrender of the leased premises or required the trustees, upon assumption of the lease, to mine and deliver to the railway company sufficient coal to cover its advances; and it further held that the lease having expired, the assets of the estate, consisting in part of the money received for coal delivered to the railway company, should be subject to the payment of such debt as a preferential claim.

*Mr. Frank Hagerman,* with whom *Mr. John S. Dean* was on the brief, for appellants:

Inasmuch as the fund out of which the advances were to be repaid remained in the bankrupt's custody, no equitable assignment was made, or equitable charge created, hence upon no theory could the intervenors prevail.

The pleadings, evidence, referee's report, finding of the trial judge and opinion of the Circuit Court of Appeals all show that the alleged payment was expected to be made from a fund in the custody of the debtor.

There was no assignment if the payment was to be from fund in hands of the debtor. *Christmas* v. *Russell,* 14 Wall. 69, 84; *Dillon* v. *Barnard,* 21 Wall. 430, 440; *Meyer* v. *Delaware R. R. Construction Co.,* 100 U. S. 457, 477; *Ex parte Tremont Nail Co.,* 24 Fed. Cas. 183, 184; *Putnam Savings Bank* v. *Beal,* 54 Fed. Rep. 579; *Badgerow* v. *Manhattan Co.,* 74 Fed. Rep. 926; *Commercial Bank* v. *Rufe,* 92 Fed. Rep. 795; *Hale* v. *Dressen,* 76 Minnesota, 183; *Hicks* v. *Roanoke Brick Co.,* 94 Virginia, 746; *Hossack* v. *Graham,* 20 Washington, 192; *Silent Friend Mining Co.* v. *Abbott,* 7 Colo. App. 73.

Bankruptcy gave no higher right to the intervenors. There was no equitable assignment even if a solemn contract had been made by the debtor to pay for advances out of coal to be by it mined in the future. Had there been no bankruptcy, the alleged agreement would have created only a general debt enforcible at law. *Ex parte Tremont Nail Co.,* Fed. Cas. No. 14,168; *Silent Friend Mining Co.* v. *Abbott,* 7 Colo. App. 73.

However, had there been a modification of the contract exactly as alleged, written out and attached to the original contract, there could have been no cancellation of the lease. There having been no reservation of the right of reëntry for a breach of the modified agreement, there was no right to a surrender of the property, which was the only relief sought. 18, A. & E. Enc. of L. (2d ed.), 369; *Hague* v. *Ahrens,* 53 Fed. Rep. 58, 60.

To like effect are: *In re Pennewell,* 119 Fed. Rep. 1391; *Doe*

v. *Godwin,* 4 Maule & S. 265; *Crawley* v. *Price,* L. R. 10 Q. B. 302; *Den* v. *Post,* 25 N. Y. Law, 285; *Spear* v. *Fuller,* 8 N. H. 174; *Wheeler* v. *Dascombe,* 3 Cush. 285; 1 Washb. Real Prop., § 504.

*Mr. Robert Dunlap,* with whom *Mr. Wm. H. Smith* and *Mr. Gardiner Lathrop* were on the brief, for appellees:

By advancing or prepaying, at the request of the bankrupt, for coal which that company was obliged to furnish under the written lease and agreement, that company and the railway company to that extent and in that particular varied or modified the mode of performance required of the railway company by the written contract and modified or varied its terms so far as applicable to coal so paid for in advance. That, as contracting parties, they had the lawful right to do, and strangers to the contract are in no position to question what was done. 1 Parsons on Contracts (9th ed.), star pages 4 and 5; *Youngberg* v. *Lamberton,* 91 Minnesota, 100; *Bryant, Adm.,* v. *Stephens* 58 Alabama, 636; *Holman & Woods* v. *The Georgia R. R.,* 67 Georgia, 595; *Cline* v. *Shell,* 43 Oregon, 372; *Hull* v. *Pitrat,* 45 Fed. Rep. 94; *Insurance Co.* v. *Hinesley,* 75 Indiana, 1; *Prudential Ins. Co.* v. *Sullivan,* 27 Ind. App. 30.

The testimony shows that the transactions between the railway company and the coal company were understood and intended by the parties as a variation or modification in the mode of performance of the written stipulations in the agreement to the extent that the advances were made by the railway company. Such advances were not made on the general credit of the coal company, but in view of and upon the strength of its contract obligation to furnish the railway company with coal under the written agreement.

This arrangement was made in view of the contractual relations between the parties, as evidenced by the written contract, and it must be assumed that the advances were made on the faith of and in reliance upon the contract obligation of the Mount Carmel Company to furnish coal. *Carr* v. *Hamilton,*

129 U. S. 252; *Fourth St. Bank* v. *Yardley*, 165 U. S. 634; *Jennings* v. *Bank*, 79 California, 323; *Stellings* v. *Jones Lumber Co.*, 116 Fed. Rep. 261, 266, 267.

The trustee in bankruptcy, in assuming to take the benefits under or to carry out the lease and agreement of the coal company, stood in the same plight as that company in respect to such contract, and could only assume it or take the benefits thereunder subject to all adjustments theretofore made and to all equities in favor of all the other parties to such agreement and in the exact condition in which such contract was at the date of the adjudication in bankruptcy. *York Mfg. Co.* v. *Cassell*, 201 U. S. 344; *Hewit* v. *Berlin Machine Works*, 194 U. S. 296; *Stewart* v. *Platt*, 101 U. S. 731; *Yeatman* v. *Savings Institution*, 95 U. S. 764; *Thompson* v. *Fairbanks*, 196 U. S. 526; *Hauselt* v. *Harrison*, 105 U. S. 401; *Winsor* v. *McLellan*, 2 Story, 492 (Fed. Cas. No. 17,887); *Winsor* v. *Kendall*, 3 Story 507 (Fed. Cas. No. 17,886); *Ex parte Newhall*, 2 Story, 360 (Fed. Cas. No. 10,159).

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

We shall not stop to discuss the question of jurisdiction. That whole subject has been so fully considered in the case just decided of *Coder, Trustee, etc.*, v. *Arts, post*, p. 223, that any further discussion of the subject would be superfluous.

We pass directly to the merits, and in order to a clear understanding of them the facts of the dealings between the coal company and the railway company must be borne in mind. The railway company entered into its original contract for the sake of securing the constant supply of coal necessary for the operation of part of its railway. It was to take from the coal company daily all the coal required therefor at prices fixed in the contract, and to make payment therefor on the fifteenth day of each month for all coal delivered to it during the preceding calendar month. It was not engaged in the business of money

lending.  Its entire arrangement was for the purpose of securing daily its needed coal, and that was fully understood by all the parties.  After a while the coal company became embarrassed, found difficulty in securing money for the payment of its employés, whereupon and in order to prevent any delay on the part of the coal company or any embarrassment which it, the railway company, might suffer from failing to receive from the coal company the needed amount of coal it advanced money to the coal company to enable it to pay its employés, and thus to continue the performance of its obligation to mine and deliver the coal.  The railway company was simply paying in advance instead of waiting until the fifteenth day of the succeeding month, and the money by it loaned was not loaned as an independent transaction—such as would be made by an ordinary money lender—but an advancement made in anticipation of the delivery of the coal.  To ignore this element and make the bankruptcy proceedings operate to discharge this obligation of the coal company, and leave the transaction as one of an independent loan of money to the coal company would result in destroying the full equitable obligations of the coal company, and place the parties in their relations to each other on an entirely different basis from what had been contemplated by them when they entered into this original arrangement.  While decisions directly in point may not be found, yet see *Ketchum* v. *St. Louis,* 101 U. S. 306–317; *Hauselt* v. *Harrison,* 105 U. S. 401; *Carr* v. *Hamilton,* 129 U. S. 252; *Fourth Street Bank* v. *Yardley,* 165 U. S. 634.  In *In re Chase,* 59 C. C. A. 629, 631, Circuit Judge Putnam, delivering the opinion of the Circuit Court of Appeals of the First Circuit, says:

"It is settled that a trustee in bankruptcy has no equities greater than those of the bankrupt, and that he will be ordered to do full justice, even in some cases where the circumstances would give rise to no legal right, and, perhaps, not even to a right which could be enforced in a court of equity as against an ordinary litigant.  Williams' Law of Bankruptcy (7th ed.), 191.  Indeed, bankruptcy proceeds on equitable principles so

broad that it will order a repayment when such principles require it, notwithstanding the court or the trustee may have received the fund without such compulsion or protest as is ordinarily required for recovery in the courts either of common law or chancery."

In *Thompson* v. *Fairbanks*, 196 U. S. 516, 526, this court said:

"Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or encumbrance of the property which is void as against the trustee by some positive provision of the act."

The purpose of the parties is very clearly expressed in the following quotation from the opinion of the Court of Appeals:

"It appears that the coal company, while the contract was still in force and being executed, became embarrassed and unable to meet its pay rolls; as a result it might not be able to mine or deliver the coal which it had agreed to mine and deliver to the railway company, and which the latter imperatively required for its daily consumption. In this state of things the railway company agreed to waive its right to withhold payment for fifteen days after the coal was delivered to it and pay for some of it before it was delivered; and the coal company agreed, as found by the trial court, to repay such advances, not in money, but by furnishing coal in the months of July and August following, at the price fixed by the original contract. This arrangement, made when the coal company was in embarrassed circumstances, and obviously inspired by the necessity of meeting the pay rolls, and for the ultimate purpose of securing performance of the only part of the original contract in which the railway company was interested, namely, securing its supply of coal, is so intimately and vitally related to the original contract that we are unable to agree with the trial court that it was intended to be independent and separate from it. It was not, in our opinion, a modification of any of the substantive

provisions of the contract, but was a change rendered necessary by subsequent events in the method of its execution only. It was an arrangement in no manner inconsistent with any of the provisions of the original contract, but only in aid of its execution.

"The contract after the new arrangement remained as before. The coal company still had a right to mine coal on the same terms and conditions as before and was bound to supply the daily needs of the railway company as before. The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to pledge a sufficient amount of coal after it should be mined as security for the payment of advances made. This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it and treat it as creating an equitable charge or lien, however inartificially it may have been expressed."

We fully approve of this interpretation of the transaction. Equity looks at the substance and not at the form. That the coal for which this money was advanced was not yet mined, but remained in the ground to be mined and delivered from day to day as required, does not change the transaction into one of an ordinary independent loan on the credit of the coal company or upon express mortgage security. It implies a purpose that the coal as mined should be delivered, and is from an equitable standpoint to be considered as a pledge of the unmined coal to the extent of the advancement. The equitable rights of the parties were not changed by the commencement of bankruptcy proceedings. All obligations of a legal and equitable nature

remained undisturbed thereby. If there had been no bankruptcy proceedings the coal as mined was, according to the understanding of the parties, to be delivered as already paid for by the advancement. ·

We think the conclusions of the Circuit Court of Appeals are right, and its judgment is

*Affirmed.*

MR. JUSTICE HOLMES concurs in the judgment. ·