## In re MILLER–ROSE CO.

### PATTISON v. NATIONAL BANK OF LA CROSSE, and four other cases.

Circuit Court of Appeals, Seventh Circuit. December 6, 1929.

Nos. 4174–4177, 4179.

In Cases Nos. 4174, 4175, and 4176:

E. S. Jedney, of Black River Falls, Wis., for appellant.

George H. Gordon, of La Crosse, Wis., for appellees.

In Case No. 4177:

E. S. Jedney, of Black River Falls, Wis., for appellant.

George H. Gordon, of La Crosse, Wis., Walter C. Kirk, of Chicago, Ill., and Jesse E. Higbee, of La Crosse, Wis., for appellees.

In Case No. 4179:

George H. Gordon, of La Crosse, Wis., for appellant.

Walter C. Kirk, of Chicago, Ill., and Jesse E. Higbee, of La Crosse, Wis., for appellees.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. Nos. 4174, 4175, and 4176 are contests between appellant (called trustee), trustee in bankruptcy of Miller-Rose Company (called bankrupt), and appellee, National Bank of La Crosse (called bank), for funds paid into court, under stipulation, by customers of bankrupt for produce.

In Nos. 4177 and 4179 there is a contest over the proceeds of a car of poultry, shipped

by bankrupt to Armour & Co. (called Armour). The fund was awarded in part to appellee Armour and in part to appellant Central Cold Storage Company (called Storage Company). The trustee claimed the fund, and No. 4177 is his appeal. The bank also claimed the fund, and No. 4179 is its appeal.

Bankrupt, at La Crosse, Wis., for many years prior to the matters here involved, that happened in the first half of April, 1927, carried on a wholesale produce business, covering many states. For several years it had done business with all the parties to this litigation, other than the trustee. Up to April 18, 1927, when bankrupt made public its insolvency. its business reputation and financial standing, so far as appears, were unquestioned. For several years, it had had what is called a "transfer" business with the bank; that is, the bank took drafts, drawn by bankrupt on its customers, and credited the amount thereof to bankrupt, and bankrupt at once checked the money into its account in another bank.

For some months prior to public admission of insolvency, bankrupt's financial condition was such that its president, Miller, and its treasurer and manager, Ritter, met every morning and made up a list of drafts necessary to be drawn to get money to conduct the business for the day. President Miller made up shipping orders for produce to be sent each of its customers, against whom a draft was to be drawn. Ritter then made up the drafts, on blanks procured from the bank, and attached to each draft a spurious bill of lading, on regular blanks that were only partially filled out, but embodied the information shown in the shipping orders furnished by Miller. Pinned to some of the drafts was a memorandum "Hold for arrival of goods." The daily drafts taken averaged about $20,000. Some days after each draft was taken, shipment was made to each customer on whom a draft had been taken by the bank, and genuine bill of lading was taken therefor; but, except as to four or five which the bank got from bankrupt on April 19, 1927, it does not appear what became of them. It does not appear that anybody connected in any way with any of the transactions in question, other than bankrupt, knew that there were bills of lading other than those attached to the drafts.

The matters here in controversy were brought into the District Court by stipulation.

In No. 4174, the bank, on April 4th, took, with a spurious bill of lading attached, a draft for $2,250 on Hilton & Aldrich, of Boston, from whom bankrupt had a standing order for a shipment of produce each week. In the bill of lading, bankrupt was named both as consignor and consignee; destination, Boston; the route was specified, but car number and initials were not given; contents, one car butter and eggs. The actual shipment was made April 7th, and the genuine bill of lading showed the same consignor, consignee, and destination as in the spurious bill; there was some difference in the specified route; the car initials and number were given; the shipment was 107 boxes of butter and 17 crates of butter. April 12th, a $2,000 draft was taken by the bank, also on Hilton & Aldrich. The spurious bill of lading attached, which was not dated, except at La Crosse, Wis., showed bankrupt as consignor and consignee; destination, Boston; routing, car initials, and car No. 10803 were given; contents, one car butter and eggs. The actual shipment was made April 14th, and the bill of lading showed the same consignor, consignee, and destination; the routing was different; car initials were the same, but the number was 10812; the shipment was of butter and eggs, but the quantities were different from those in the spurious bill.

In No. 4175, the bank took a draft, dated April 14th, on H. J. Keith Co., of Chicago, for $2,500, and with it a spurious bill of lading, in which bankrupt was consignor and consignee; destination Chicago; routing was given; car initials were not given; car number was 85455; contents, one car of eggs. April 16th there was made a genuine bill of lading, for the shipment made that day, with bankrupt as consignor, H. J. Keith Company, consignee, with the same routing, car initials URT, car No. 85455, contents 388 cases of eggs, 288 loaded at Albert Lea.

In No. 4176, the bank took a draft, on April 14th, for $2,750 on H. J. Keith Company. A spurious bill of lading showed the bankrupt both as consignor and consignee, destination Chicago, car initial URT, number 84081, for one car of eggs. The genuine bill of lading, dated April 15th, showed bankrupt as consignor, H. J. Keith Company as consignee, destination Chicago, routing is given, car initial URT, number 84081, contents 400 cases rehandled and repacked eggs.

Although the spurious bills of lading were known as "straight" bills of lading, and were not signed by any railroad, yet they were indorsed by bankrupt, and bankrupt did everything it could to make the spurious look like genuine bills. The bank accepted them as genuine; and it was intended by bankrupt

that it should do so, and it does not appear that until all of the drafts here in question were taken the fact that the bills of lading were spurious became known to the bank. A great many drafts were taken by the bank and were paid from the proceeds of goods shipped on the genuine bills of lading, and from the manner in which the business was handled it is apparent that it was the intention of bankrupt that the drafts should be so paid. Except that five genuine bills of lading were found in the files of bankrupt the day after it disclosed its insolvency, all of which were then delivered to the bank, it does not appear that any use of the genuine bills of lading was ever made by the bankrupt. Why the drafts in Nos. 4174, 4175 and 4176 were not paid does not appear, but it is not claimed that such failure was because of the spurious bills of lading. It occasionally happened that in cases where there were spurious bills of lading, followed by shipments on a genuine bill of lading, the drafts, for some reason, were not accepted or the shipment was diverted. In other cases, it happened that the customer would not pay as much as the draft called for. In cases where the drafts were not accepted, and in those cases where the actual shipments were diverted, bankrupt, with a certified check, paid the bank for such drafts. In cases where a customer did not wish to advance the amount called for by the draft (presumably those were consignments) bankrupt arranged either with the bank or with the consignee for a reduction of the amount of the draft, and the amount, as reduced, was paid by the customer.

The decision in Nos. 4174, 4175 and 4176 in the District Court was favorable to the bank.

■ As to the findings in Nos. 4174, 4175 and 4176, we are of opinion that the facts show that as between the bank and the trustee, the only interested parties, the transactions in each case amount at least to an equitable assignment, valid and binding as against the trustee. Fourth St. Bk. v. Yardley, 165 U. S. 635, 17 S. Ct. 439, 41 L. Ed. 855; Hurley v. Atchison, T. & S. F. Ry., 213 U. S. 126, 132, 29 S. Ct. 466, 53 L. Ed. 729; Sexton v. Kessler & Co., 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995; Gorman v. Littlefield, 229 U. S. 19, 33 S. Ct. 690, 57 L. Ed. 1047; Beacon Trust Co. v. Dolan (C. C. A.) 27 F.(2d) 247; Penn Lumber Co. v. Wilson (C. C. A.) 26 F. (2d) 893.

The judgment in each of those cases is affirmed.

Nos. 4177 and 4179. Bankrupt for several years had done business with Armour and the Storage Company. Armour sold for bankrupt on commission, and it was Armour's practice to advance eighty per cent. of the value of the produce upon drafts. The Storage Company, at the time of the transaction here in question, had in storage 400,000 to 500,000 pounds of produce for which it had issued warehouse receipts to bankrupt. Bankrupt indorsed those receipts to the Storage Company, to secure judgment notes given for advances to bankrupt, amounting to about $85,000. It was the custom of the Storage Company, on request of bankrupt, to ship produce to customers of the latter on straight bills of lading, in which the customer was named as consignee and bankrupt as consignor. Those bills of lading were sent by the Storage Company direct to bankrupt. Thereafter the Storage Company had nothing to do with the bills of lading or the produce shipped. For its advancements, charges, etc., it drew on bankrupt, through the Security National Bank, at La Crosse. In the case here in question, bankrupt had arranged with Armour to ship to its Detroit house a car of poultry. April 11th, the treasurer of bankrupt, from a shipping order made up by the president of bankrupt, filled in part of a spurious bill of lading, that named bankrupt as both consignor and consignee, with destination as Detroit, contents 100 boxes of poultry, and at the bottom was printed "Miller-Rose Co., shipper, Per Central Cold Storage Co." April 14th, bankrupt directed the Storage Company to ship the car of poultry to Armour at Detroit. It was shipped on the 16th, arrived on the 17th, and was unloaded on the 18th.

From time to time, the Storage Company had shipped out poultry and had drawn drafts upon bankrupt for the amount of its advancements thereon, and several of those drafts were, at the time the shipment in question was ordered out on April 14th, unpaid, some of them for as much as twenty days.

When the order of April 14th came, the Storage Company, over the telephone, told bankrupt it wanted to know where it would get the money on its loan, and was advised to draw a draft on Armour for the proceeds coming to bankrupt on that consignment; bankrupt said it did not have any money to pay until it got the money from Armour. The Storage Company refused to draw on Armour, and bankrupt then said, "Draw a draft, and your draft will be honored immediately when it is received at the bank here"

(La Crosse, Wis.). Such a draft was drawn on bankrupt, but was not paid on presentation on April 20th. Other than the fact that the Storage Company telephoned bankrupt, as above shown, it does not appear that in the case of this last shipment it departed in any way from its former practice.

On the day its draft was presented, and not paid, the Storage Company, over the telephone and by wire, told Armour of the lien, and warned Armour not to dispose of the poultry or the proceeds until it, the Storage Company, had been satisfied. Attempt was also made to stop the car in transit, but it had already been delivered. Thereafter the Storage Company took judgment on its judgment notes in the Illinois courts, and garnisheed Armour. Concerning that judgment, the trustee, the bank, the Storage Company, and Armour stipulated as follows:

"The judgment entered by the Central Cold Storage Company in the municipal court of Chicago, upon which said judgment it garnisheed Armour & Co. and H. J. Keith Company, be vacated and held for naught, and that the said cause in the municipal court of Chicago shall be forthwith dismissed, and that the funds involved be paid into the hands of the clerk of the District Court of the United States for the Western District of Wisconsin, and that the claims of all parties to said funds shall be submitted to the referee in bankruptcy, of said court, and that said parties shall abide the judgment of said referee with reference thereto."

A further stipulation was filed, setting out the claims of the respective parties to the funds on the Keith and Armour shipments. It is admitted that the shipment to Armour was a consignment, and its claim, allowed by the court, was for commissions, etc., in handling and selling the poultry.

In Nos. 4177 and 4179, the decision was favorable to Armour to the extent of its claim as factor for commissions, etc., and as to the remainder of the fund it was favorable to the Storage Company.

■ No one seems very seriously to contest the Armour claim. In any event, we are of opinion that the finding in its favor was right.

The reasons that impelled us to hold against the trustee in Nos. 4174, 4175, and 4176 are here present, and require that, as between the bank and the trustee, the holding should be favorable to the bank. As between the Storage Company and the bank, and the Storage Company and the trustee, questions of some difficulty present themselves.

It is conceded that the Storage Company, before the shipment, had a lien upon the poultry sent to Armour. We are of opinion that, without more appearing, we would have to hold that the taking of the bill of lading in the name of bankrupt, as consignor, and Armour, as consignee, and delivering the same to bankrupt, without the payment of its advancements thereon, amounted to a release of its lien, which it had by virtue of the warehouse receipts assigned to it. When it refused to make a draft on Armour, but elected to draw a draft through bankrupt's bank at La Crosse, upon the promise that the draft would be paid when presented, and without retaining the bill of lading, it did no more and exacted no more than it had done and exacted on many previous occasions when it took drafts, some of which had remained in the La Crosse bank many days after demand without payment. That was another strong evidence of its intention to waive its lien. The draft was not presented for payment until April 20th, three days after the poultry had arrived and been unloaded at Detroit. As evidence that the Storage Company had not intended to release its lien, its attempt to stop the shipment in transit and its notice of lien to Armour are shown. The Storage Company afterward entered judgment on its judgment notes, in the state courts of Illinois, and garnisheed Armour.

■■ Where one has two inconsistent remedies, he must make his election which one he will pursue, and, having elected, may not have recourse to the other remedy. It was not inconsistent for the Storage Company to assert a lien, and later take a judgment upon its notes, but when it garnisheed Armour thereon, seeking to reach the property or funds in the hands of Armour, as the property or funds belonging to bankrupt, it was pursuing inconsistent remedies. When the bank, the trustee, the Storage Company, and Armour went into the bankruptcy court, and submitted all questions for its determination, it was stipulated that the proceedings in the state court should be entirely wiped out, and, the language of the stipulation is, "held for naught." It seems quite plain that the garnishment proceedings, being within four months of bankruptcy, could have availed the Storage Company nothing as against the trustee. If the question of the conflict between the two remedies is important, we must hold that, the Storage Company having first elected to reclaim the property or the proceeds thereof under its lien, its subsequent attempt to reach the property by garnish-

ment can avail nothing, either for or against the Storage Company.

The bank did not advance its money, or do any other thing, relying upon any act or thing done by the Storage Company. Although we do not think that the bare promise that the Storage Company's draft would be paid when it was presented amounted to a fraud, yet that fact, taken in connection with the further fact that bankrupt was insolvent, and must have known that it had no present or prospective ability to pay the draft when it was presented, amounted to a fraud upon the Storage Company, and it should be held to have the right to maintain its lien. As between it, the bank, and the trustee, the equities are with the Storage Company.

The order of the District Court in each case is affirmed.