**BRAMHAM et ux. v. FIRST NAT. BANK OF DURHAM, N. C., et al.**

District Court, E. D. North Carolina, Durham Division.

Nov. 21, 1934.

H. G. Hedrick, W. B. Guthrie, and J. L. Morehead, all of Durham, N. C., for plaintiffs.

S. C. Chambers and R. H. Sykes, both of Durham, N. C., for defendants.

MEEKINS, District Judge.

This is a suit in equity to remove cloud on title. Complainants are seeking the cancellation and surrender of their certain promissory note executed January 26, 1924, payable to Southgate Jones, and of their certain deed of trust, of even date of the note, executed to W. J. Brogden, trustee, securing the note. The deed of trust conveys the home of complainants who hold the same as tenants by the entirety. In their answer and cross-bill, defendants deny complainants' right to the relief demanded, aver that the title to the note and deed of trust is now in the receiver of the First National Bank of Durham, Durham, N. C., and upon this and other grounds seek leave of the court to foreclose the deed of trust, or at least to sell the property described therein, for the purpose of discharging complainants' indebtedness to the bank.

The evidence on the hearing was short and, except in one particular, without serious conflict. Only two witnesses were offered, W. G. Bramham, hereafter called Bramham, one of the complainants, who testified on their behalf, and Southgate Jones, hereafter called Jones, who testified for defendants. From their testimony it appears that on or prior to the 25th day of January, 1924, complainants purchased, or agreed to purchase, from J. S. Patterson, commissioner, and Idalaine Starrett a certain house and lot in the city of Durham, N. C., referred to in the pleadings and evidence as complainants' homeplace; that the deed for the property was prepared on January 25, 1924, though the evidence leaves it uncertain as to when it was delivered; that on the following day Bramham applied to the First National Bank of Durham, hereafter called the bank, through Jones, its then active vice president, for a loan of $12,000 with which to complete payment of the purchase price of the property; that the loan was made and the money derived from it was actually so applied; that the application for this loan was made verbally to Jones, then and theretofore, for ten or twelve years, the active vice president of the bank, between whom and Bramham all negotiations were conducted, Bramham representing complainants and Jones representing the bank; that in making this application Bramham stated to Jones he desired to borrow the money upon the open or unsecured note of himself and wife, to which statement Jones responded that he did not think there would be any trouble about arranging the loan as applied for, adding, however, that it might be well for complainants to execute a deed of trust on their homeplace securing a $12,000 note payable to him, so that if the bank should decline to make the loan on complainants' open or unsecured note, he would indorse their note payable to the bank and hold the note payable to him, secured by the deed of trust, as security for his indorsement; that Bramham assented to this suggestion, and thereupon prepared a note payable to the bank in the sum of $12,000 and prepared a note payable to Jones in the same amount and of the same date, and prepared a deed of trust on complainants' homeplace to W. J. Brogden, trustee, securing the payment of the latter note payable to Jones, all of which instruments were executed and delivered to Jones on January 26, 1924; that later, on the same day, Bramham was notified by Jones that the loan had been made by the bank and the money placed to Bramham's credit in the bank; that Jones did not indorse complainants' note payable to the bank, or any renewal thereof, nor was he required or requested by the bank to do so, but that this was not discovered by complainants until long after the transaction was consummated; that in the meantime, to wit, on January 28, 1924, Jones caused the deed of trust to Brogden, trustee, to be duly registered; that Jones continued to hold complainants' $12,000 note, payable to him, until the 26th day of December, 1931, when he indorsed it, without recourse, to the bank, and that on January 16, 1932, the bank suspended business, when, shortly thereafter, C. H. Dixon was duly appointed its receiver. Also it appears from averments in sections 3 and 7 of defendants' further answer that during most of the time the bank carried the loan to complainants, and particularly from about 1925 until 1930, the complainants were amply solvent and able to pay the loan upon demand; that complainants did pay upon the indebtedness the sum of $5,000, in addition to all interest, thus reducing the indebtedness to $7,000; that during this period, or theretofore, the bank loaned complainants an additional sum of $9,900 upon their open or unsecured note, which note the bank continued to carry until it closed, without demand or request for security just as it carried the loan under consideration without demand or request for security; and that on October 26, 1931, the note under consideration and

the note representing the $9,900 loan were consolidated by the bank, with the consent of complainants, and one note of $16,900 was executed by complainants, thus merging the indebtedness of complainants for which security was neither given by complainants nor requested by the bank.

So far the testimony of Bramham and Jones displays no disagreement. But the testimony of Jones goes further. He says that, following the application for the loan and the conversation then ensuing, he communicated Bramham's proposition to W. J. Holloway, president of the bank, and thereafter advised Bramham that Holloway said that the bank would make the loan upon the security of the homeplace which, he says, Bramham agreed to give. Throughout his testimony, however, this witness professes that his recollection of the entire transaction is vague and uncertain. It is further contradicted by the testimony of Bramham, at least by clearest implication. What is more important, it is wholly inconsistent with the form of the transaction as subsequently consummated.

From his position with the bank, which he had held for ten or twelve years, it is to be assumed that Jones was a man of intelligence and of wide business experience. While it is true that the notes and deed of trust involved were drawn by Bramham, it is equally true that they were delivered to Jones who, prior to the consummation of the loan, had an adequate opportunity of ascertaining their terms and provisions. It is inconceivable that a man of Jones' position and business ability should have accepted these notes and the deed of trust to Brogden, trustee, as in accord with an agreement under which security was to be given direct to the bank. Without imputing to the witness the slightest bad faith, it would seem that this phase of Jones' testimony reflects his present conception of what ought to have been done rather than a definite recollection of what actually transpired.

In considering the case, a preliminary question arises as to the admissibility of evidence to vary, alter, or contradict the terms of the deed of trust to Brogden, trustee. Complainants contend that the parties have reduced their engagements to writing, the provisions of which are clear and unequivocal; that evidence to vary them, therefore, is admissible only upon allegations of fraud, mistake, accident, or inadvertence; that the allegations of the cross-bill lack the factual precision necessary to raise an

issue of this nature, and hence to render competent, evidence looking to the reformation of the instrument; and that parol testimony may be offered only to explain that which is vague; never to change that which is plain. With this contention I have at all times agreed, the evidence offered by defendants having been admitted, not for the purpose of varying the terms of the deed of trust and so permitting reformation of the instrument, but solely as affording a basis for other alleged defenses, if sufficient for that purpose. Nor is the evidence, in any respect, sufficient to justify a reformation of the instrument, even though a proper issue was raised by the pleadings. It is true that Bramham prepared the notes and deed of trust and delivered them to Jones. But there is no suggestion that Bramham misrepresented their contents, or employed other means of preventing Jones, or other officials of the bank from discovering their true character. It further appears that the note payable to Jones, and the deed of trust securing it, remained in Jones' possession for approximately eight years without complaint that either was not drawn in accordance with the true intendment of the parties and the true contract or agreement between them. In these circumstances, it is well settled that no basis is afforded for the reformation of the instrument. Colt Co. v. Kimball, 190 N. C. 169, 129 S. E. 406; Colt Co. v. Conner, 194 N. C. 344, 139 S. E. 694; Newbern v. Newbern, 178 N. C. 3, 100 S. E. 77; Williamson v. Rabon, 177 N. C. 302, 98 S. E. 830. It follows that the questions presented are to be resolved, and the rights of the parties determined upon the basis of the transaction as actually consummated by them.

Defendants insist, however, that their right to relief is not foreclosed by a denial of the right of reformation. They contend that, irrespective of the form which the transaction finally assumed, it is clear from the previous negotiations that the deed of trust was actually intended as a security for the bank, and not as a security for Jones, and that I should give effect to the actual intention of the parties. Unfortunately for this contention, the instrument, which is clear and unambiguous, is not so written. Not only is it in the usual form of an indemnity contract for the benefit of Jones alone, but it further specifically provides: "This deed of trust and note secured thereby are executed to the party of the third

part (Southgate Jones) to protect him against loss by reason of his indorsement on a note for twelve thousand dollars ($12,-000.00) executed by parties of the first part and payable to the First National Bank of Durham, North Carolina, dated of even date herewith." The language is plain. The meaning is clear. There can be no division of minds as to what is said. It explains itself. There is nothing which indicates intention or purpose to secure the bank. It is merely to read the deed of trust to know who was secured and why. When Jones read it, and I cannot think he did not read it, dealing as he was with a transaction of such importance, he saw at a glance that complainants secured him and not the bank. It is inconceivable that Jones did not fully understand language so plainly and clearly written. In giving it effect, I am controlled by the intention which has been legally expressed.

Nor am I impressed with the contention that defendants are entitled to an equitable lien upon the property. Equity, it is true, is not bound by the form, but seizes the substance and affords relief where the law, by reason of its universality, is deficient, so moulding its decrees as to fit the exigencies of each particular case. Mc-Ninch v. Trust Company, 183 N. C. 40, 110 S. E. 663. Equity regards as done that which ought to have been done. But equity, nevertheless, can act only upon the basis of established relationships. It has no power to create new engagements between the parties, or to impose upon them obligations which do not arise naturally and reasonably from their previous conduct or agreements.

In Garrison v. Vermont Mills, 154 N. C. at page 4, 69 S. E. 743, 744, 31 L. R. A. (N. S.) 450, Mr. Justice Brown speaking for the court upon the question of equitable liens, it is laid down: "They arise either from a written contract, which shows an intention to charge some particular property with a debt or obligation, or are declared by a court of equity from the facts and circumstances of a case. Where there is an intention coupled with a power to create a charge on property, equity will enforce such charge against all except those having a superior claim." And in the same case, at page 8 of 154 N. C., 69 S. E. 743, 745, it is laid down: "While I have discussed the doctrine of equitable liens, equitable rights, and equitable mortgages, and have used those terms, it is for the purpose of showing how equity will look at the substance of any

transaction and compel the appropriation of property in accordance with the agreement of parties." North v. Bunn, 122 N. C. 766, 29 S. E. 776; Burns v. McGregor, 90 N. C. 222.

To the same effect are the law-writers and the decisions of many courts. 3 Pomeroy Equity (1st Ed.) § 1233; Ketchum v. St. Louis, 101 U. S. 306, 25 L. Ed. 999; 1 Jones on Liens, § 27; Bisphan's Eq., § 351; Hurley v. Railroad, 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729; Jones on Mortgages (7th Ed.) vol. 1, § 162; Shaw v. Meyer-Kiser Bank (Ind. App.) 137 N. E. 720, 723; Foster Lumber Company v. Harlan County Bank, 71 Kan. 158, 80 P. 49, 114 Am. St. Rep. 470, 6 Ann. Cas. 45. In Pomeroy's Equity Jurisprudence, it is laid down: "The form or particular nature of an agreement which shall create a lien is not very material for Equity looks at the final intention and purpose rather than at the form and if the intention appears to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given, or charged, can be sufficiently identified, the lien follows."

From these authorities it is apparent that in shaping its decrees, equity, no more than the law, may disregard the intention of the parties. If the intention to create a lien has been effectuated, the law will secure and enforce the rights of the parties by its own mandate; if, by reason of fraudulent repudiation or defective execution, the intention has not been effectuated, equity will impress and foreclose the lien when necessary to the ends of justice. But, whether at law or in equity, the basis of action is the intention of the parties as disclosed by their final contract or previous negotiations.

It follows that defendants are not entitled to an equitable lien upon the property. As I have said, complainants never agreed to give security to the bank, but only to Jones for his indorsement. This agreement has not been repudiated nor was its execution defective. On the other hand, it has been executed in strict accord with the true and declared intention of the parties. Equity is powerless to extend the terms or obligations of a contract which has been so consummated.

Nor will equity subrogate defendants to the rights of Jones in the note payable to him and the deed of trust securing it. The equitable principle under which a creditor

is subrogated to the security given a surety, indorser, or other person secondarily liable is not without qualification. Particularly is this true where, as in this case, the security is by way of indemnity, and so wholly personal to the surety. In such cases it is generally held that something more must be shown than the surety's title to the security before equity can intervene. In his concurring opinion in First Nat. Bank v. Jenkins, 64 N. C. 719, Mr. Chief Justice Pearson concludes that the principle arises out of equity's jurisdiction to prevent fraud and hence is applicable only in cases where the surety is insolvent. Wiswall v. Potts, 58 N. C. 184. All the authorities agree that, in the absence of an actual suretyship, or of some contractual relationship of like nature, the principle does not obtain. Stone v. Palmer, 166 Ill. 463, 46 N. E. 1080; Fagan et al. v. Thompson (C. C.) 38 F. 467.

In the instant case there is no evidence that Jones was insolvent. Moreover, it is admitted that he never indorsed complainants' note payable to the bank, and it nowhere appears that he ever agreed to do so. The only agreement suggested is that between Jones and Bramham to the effect that Jones would indorse complainants' note payable to the bank, if required by the bank to do so, but not otherwise. Furthermore, the question of defendants' right to subrogation becomes purely academic in the light of the fact, also admitted, that Jones subsequently indorsed to the bank the note payable to himself secured by the deed of trust to Brogden, trustee. By virtue of this indorsement, the bank immediately became invested with all Jones' right, title, and interest in and to the note payable to Jones and its security; and, having thus acquired title through the conventional act of the parties, the bank has no occasion to invoke the application of equitable principles. With reference to the bank's right the determinative question is: What title did Jones have to the note payable to him and to the deed of trust to Brogden, trustee, securing the note?

From the nature of the transaction, it is entirely clear that Jones acquired title to neither of these instruments. It follows that he could pass no title to the bank, which took the note payable to him, by virtue of his indorsement long after its maturity. It appearing that Jones never indorsed complainants' note payable to the bank, or became obligated to do so, the entire transaction as between complainants and Jones was without consideration.

It is insisted, however, that instruments signed, sealed, and delivered may not, on the sole ground of a want of consideration, be canceled in equity; and, certainly, there is strong authority for this position. 4 R. C. L. 500, and cases cited. But whether these authorities are applicable upon this record is another question, which it is unnecessary here to pass upon. For the purposes of this case, it is sufficient to note that neither of these instruments was ever delivered; or, to speak more accurately, that their delivery by Bramham to Jones was conditional and not absolute. The evidence leaves no doubt that they were delivered upon the understanding, at least clearly implied, that neither should become operative, or take effect as a binding obligation, unless and until Jones, as a prerequisite to securing the loan for complainants, should indorse their note payable to the bank. Jones, having failed to indorse complainants' note payable to the bank, and the loan having been obtained without a requirement that he do so, it is settled by the uniform holdings of the courts in like cases that neither the note payable to Jones nor the deed of trust securing the note became operative, or took effect as a binding legal instrument, in the hands of Jones or his transferee. Therefore, it appears to me that the note and deed of trust are like salt that has lost its savour. Pratt v. Chaffin, 136 N. C. 350, 48 S. E. 768; Kelly v. Oliver, 113 N. C. 442, 18 S. E. 698; Wilson v. Powers, 131 Mass. 539; Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 176, 32 L. Ed. 563.

In Wilson v. Powers, supra, it is laid down: "The manual delivery of an instrument may always be proved to have been on a condition which has not been fulfilled, in order to avoid its effect. This is not to show any modification or alteration of the written agreement, but that it never became operative, and that its obligation never commenced."

In Ware v. Allen, supra, it is laid down: "We are of opinion that this evidence shows that the contract upon which this suit is brought never went into effect; that the condition upon which it was to become operative never occurred; and that it is not a question of contradicting or varying a written instrument by parol testimony,— but that it is one of that class of cases, well recognized in the law, by which an instrument, whether delivered to a third person as

an escrow, or to the obligee in it, is made to depend, as to its going into operation, upon events to occur or to be ascertained thereafter."

It was insisted by defendants at the hearing that the case, viewed from its four corners, presents a moral obligation of complainants to pay their debt evidenced by their solemn legal contract embraced in the terms of their note to the bank, and that in the peculiar circumstances of this case they should suffer their home to be sold to pay the indebtedness irrespective of whether, in law or in equity, they can be compelled to do so. Sound morals permit no shuffling. One who owes should pay. One who can and refuses should be made to pay. Clearly, complainants should pay their obligation to the bank if they can. Doubtless they are in accord with this observation. But if they cannot pay, their refusal to surrender their home for such purpose constitutes no breach of moral obligation determined by the record in this cause. The record discloses no intimation of bad faith—certainly no proof that the loan was obtained by a trick.

The fact that complainants were amply solvent at the time the loan was made in 1924 and continued solvent and able to pay upon demand until 1930, a period of six years, as shown by section 7 of defendants' further answer, considered together with the further fact of the curtailment of the indebtedness by $5,000 and current interest, nearly one-half of the original debt, as shown by section 3 of defendants' further answer, are evidentiary of good faith rather than bad. Moreover, when, on October 26, 1931, the bank, apparently without suggestion of complainants, but, of course, with their consent, merged or consolidated the notes as appears above, the bank scrambled the eggs. It has not been suggested by complainants that the merger worked a novation or an extinguishment of the original $12,000 note. Inasmuch as no one has raised that question, I pretermit discussion with regard to it.

It is clear that complainants were willing to mortgage their home to secure the debt as evidenced by the fact that they executed the deed of trust to Brogden, trustee. If called upon and required to do so, doubtless complainants would have made a mortgage direct to the bank or a deed of trust securing the bank. Certainly, it was at that time that the bank should have required the security, if it desired it, rather than to raise that question eight years later when economic distress was moving upon the face of the earth, cold, hard, and inexorable as the course of an Alpine glacier. Indeed, this movement toppled over the bank, itself, which for years had been an outstanding financial institution of the state. I repeat, it was in the inception of this transaction that the bank should have required the security; should have been timely wise because folly is that wisdom which is wise only behind hand.

The necessary conclusion is that complainants are entitled to the cancellation and surrender of the instruments—the note and deed of trust. I shall sign a decree dismissing the cross-bill and directing defendants forthwith to cancel of record the deed of trust executed by complainants to Brogden, trustee, and to surrender to complainants their $12,000 note payable to Jones.