In re ITALIAN COOK OIL CORP.

No. 10334.

United States Court of Appeals
Third Circuit.

Argued Feb. 19, 1951.

Decided Aug. 14, 1951.

Walter J. Bilder, Newark, N. J. (Bilder, Bilder & Kaufman, Newark, N. J., on the brief), for appellant.

Albert Philipson, Washington, D. C. (Newmyer & Bress, Washington, D. C., on the brief), for debtor.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

BIGGS, Chief Judge.

On February 11, 1949 Italian Cook Oil Corporation (the "Company" or the "Debtor) was in the business of manufacturing and selling mayonnaise salad dressing. The Company knew that it was about to be awarded a contract by the United States to manufacture and deliver approximately 420,000 pounds of mayonnaise for the Army for a price of about $75,000. The Company needed financing. It endeavored to procure it from Leed Products, Inc. ("Leed") but Leed desired to secure itself by an assignment of the Company's rights under the contract and of the moneys to be received thereunder. The Assign-

ment of Claims Act of 1940, amending R.S. §§ 3477 and 3737, 54 Stat. 1029, 31 U.S.C.A. § 203 and 41 U.S.C.A. § 15, provides that moneys coming due under a contract executed by the United States may be assigned only to a financing institution. For this reason, apparently, Leed arranged with Central National Bank of Richmond, Virginia, ("Central Bank"), for the necessary financing. On February 11, 1949 the Company wrote to Leed and acknowledged the receipt of $10,000 which it agreed was to be used "solely" in connection with the Army contract, and stated also that all money due or coming due under the contract would be assigned to Central Bank as soon as the contract had been awarded officially to the Company. It appears, however, that the $10,000 received by the Company from the loan was deposited by it in its bank account and was used by the Company for its general purposes. It was agreed also that the Company should keep on hand $10,000 worth of oil. The Company seems to have fulfilled its obligation in this regard.[1]

On February 18, 1949, the date the Army contract was awarded to the Company, an assignment was executed by the Company to Central Bank. The third paragraph of that assignment provided: "This assignment is made and entered into as security for the payment of any and all loans which have been or may hereafter be made by said Bank to the Assignor at any time or times, and of any and all notes which have been or may hereafter be issued to evidence any such loan or loans, and as security also for any and all other indebtedness which is now or may hereafter become due or owing by the Assignor to said Bank at any time or times. The Assignor covenants that it will receive any monies advanced hereunder by said Bank as a Trust Fund to be applied solely to payments necessary for materials, wages, and other expenses

[1.] Appellant lays much stress on what was done with the $10,000. As to the trustees, this should not matter. It appears that the money was necessary in order to perform the contract, it was loaned for that specific purpose, and if the trustees had elected not to carry out the contract, standing in the bankrupt's shoes they would also have had to return the $10,000 intact to Leed. It would appear that the defense of violation of this agreement would have been available to Leed, not to the trustees.

in fulfillment of the Contract or to repayment to said Bank of any monies so advanced by said Bank." On the same day the Company sent the assignment to Central Bank with a letter which stated in part: " * * * Your Bank is hereby authorized and directed to collect * * * [the] monies [due under the contract] from the U. S. Government and to turn the monies over to * * * Leed * * * ".

On March 23, 1949 the Company filed a petition for reorganization pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., and trustees were appointed, one of whom still remains in office. The time for the commencement of delivery of the goods to the Army under the contract had not arrived by March 23 and no goods had been delivered. On April 2, 1949 the trustees began the actual process of manufacturing goods to be delivered and two days later the trustees made the first shipment of mayonnaise under the contract. On April 11, 1949 Central Bank notified the United States that it held the assignment described above.

The trustees proceeded to assume the contract and, pursuant to the arrangements made prior to the Chapter X proceeding, sent the bill of lading and shipping documents for the first shipment to Leed for delivery to Central Bank which in turn forwarded them to the United States for payment. On April 18, 1949, before any payment was made by the United States to Central Bank, the trustees notified the United States that they had been authorized to continue the Debtor's business, that they had been advised of the assignment and would continue to make shipments under the contract but requested that payments for the mayonnaise be made direct to them. The United States advised the trustees on May 19, 1949 that, in view of the assignment to Central Bank, payment could not be made to them as they had requested. The trustees completed the contract nonetheless and made and delivered all mayonnaise contracted for to the Army. The United States refused to pay Central Bank or the trustees until it was determined who was entitled to receive payment under the contract. The trustees filed a petition for a rule to show cause why the United States should not pay the money to them. Leed and Central Bank by stipulation, however, agreed that all sums retained by the United States under the contract should be paid to the trustees under the condition that $10,000 be held in escrow to await the determination of the instant controversy. The court below referred the matter to a special master who concluded that Central Bank was entitled to the $10,000, and the court confirmed the master's report. The appeal at bar followed.

The position of the remaining trustee, as we grasp it, is that the sum of money in controversy is an "account receivable" created entirely by the trustees and therefore Central Bank can have no valid claim to it; that the money is free of any lien or encumbrance in favor of Central Bank; that the adoption of the contract by the trustees did not subject the trustees to any claim of Central Bank under the assignment and, finally, that no part of the money lent by Central Bank can be traced into the fund in escrow or into the goods delivered by the trustees under the contract. The trustee asserts that Central Bank is not entitled to receive the $10,000 now in escrow.

We cannot agree. Section 70, sub. a (6) of the Bankruptcy Act, as amended, 52 Stat. 879–880, 11 U.S.C.A. § 110, provides that the trustee shall be vested by operation of law with " * * * rights of action arising upon contracts * * ". There is no assertion in the case at bar that the contract was in any wise affected by fraud or that the assignment effected a voidable preference. A trustee is, of course, under no obligation to complete executory contracts of a debtor. By Section 70, sub. b of the Act, the trustee is given the right to adopt or reject an executory contract. He must do one or the other. If the trustee deems the contract to possess no equity or benefit for the estate he rejects it as burdensome. If, on the other hand, he concludes that the executory contract does have an equity for the estate he adopts it. These principles of law have become too well established to permit of doubt. Atchison, Topeka and Santa Fe

Railway v. Hurley, 8 Cir., 153 F. 503, affirmed 213 U.S. 126, 29 S.Ct. 466, 53 L. Ed. 729. The trustee, however, may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.

Whether the Debtor set aside oil as security or used or did not use the borrowed $10,000 to perform the contract is immaterial. What is material is that the Company prior to any bankruptcy proceedings executed a valid assignment of the money coming due under the contract to Central Bank "as security for the payment of any and all loans * * *". Additional loans were not made. But the assignment is certainly valid to the extent of the $10,000 in escrow because this amount was loaned upon the agreement that assignment would be executed. When the trustees began to perform the contract, they elected to stand in the Debtor's shoes. Upon completion of the contract the trustees had the right to receive $75,000 less $10,000 because they took the Debtor's property "with all the liabilities attached", encumbered by all the Debtor's acts and subject to all the equities to which it was liable. See 4 Collier on Bankruptcy, 14th ed., pp. 1216, 1235. Cf. Cooper v. Sun Co., 3 Cir., 33 F.2d 881, 882.

■ The assignment is valid on its face. The trustee does not attack its sufficiency.[2] There is no contention that making the loan or executing the assignment was *ultra vires* or that it was executed by the Company without authority. It is interesting to note that the contract is an ordinary third party beneficiary contract and that in New Jersey such contracts are enforceable against either the promisor or the promisee. See the New Jersey Annotation to the Restatement, Contracts, § 141,

citing Chambers v. Philadelphia Pickling Company, 79 N.J.L. 1, 75 A. 159, and other authorities. But this point is really not material. We refer to it only to show that the trustee does not attack either the contract or the assignment but merely asserts that the assignee bank may take nothing under the contract.

■ The trustee seeks to distinguish between the contract and the proceeds thereof. He probably would not contend that Central Bank was not entitled to the $10,000 if the assignment had been of the whole contract as distinguished from "any and all amounts" due under the contract. A case almost on all fours with that at bar, In re DeLong Furniture Co., D.C. E.D. Pa., 188 F. 686, was decided in 1911. The court held that an assignment equivalent to that at bar was effective in equity. A court of bankruptcy, of course, is a court of equity.

■ The Debtor was doing business in New Jersey. In the absence of any showing to the contrary we may assume that the operative facts took place in New Jersey and that the assignment was executed there. See Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 232–233. New Jersey law should be presumed to determine the effectiveness of the assignment, executed and delivered, as we have said, prior to the filing of the Chapter X proceedings. See Adelman v. Centaur Corporation, 6 Cir., 145 F.2d 573, 575–576. It is the law of New Jersey that money due and to become due under an existing contract is subject to assignment, the assignment attaching to each installment as it becomes due and payable to the assignor. Board of Education v. Duparquet, 50 N.J. Eq. 234, 24 A. 922 is on all fours with the instant case and appears to be a controlling New Jersey case. See also Structural Gypsum Corp. v. National Com. T. & M.

---

2. See Christmas v. Russell, 14 Wall. 69, 84, 20 L.Ed. 762, for requisites of equitable assignment. Also in Smedley v. Speckman, 3 Cir., 157 F. 815, 819, this court said: "To make an equitable assignment, there should be such an actual or constructive appropriation of the subject-matter as to confer a complete and present right in the party meant to be provided for, even where the circumstances do not admit of its immediate exercise. * * * 'The transfer must be of such a character, that the fund holder can safely pay, and is compellable to do so, though forbidden by the assignor.'"

G. Co., 107 N.J.Eq. 32, 151 A. 839; Weaver v. Atlantic Roofing Co., 57 N.J.Eq. 547, 40 A. 858; Bank of Harlem v. Bayonne, 48 N.J.Eq. 246, 21 A. 478, affirmed 48 N.J.Eq. 646, 25 A. 20. See also Hurley v. Atchison, Topeka & Santa Fe Railway, supra, and Adelman v. Centaur Corporation, supra. We conclude that Central Bank has a valid enforceable lien and that it makes no difference that the trustee rather than the Debtor fulfilled the contract and delivered the mayonnaise.

The judgment must be affirmed therefore, because: (1) there was a valid equitable assignment of the proceeds of the contract to the Central Bank; and (2) when the trustees performed the contract they were bound by the assignment executed by the Company prior to the institution of Chapter X proceedings; and in accordance therewith payment of proceeds would be made by the United States directly to Central Bank.

The judgment of the court below will be affirmed.